Salvatore and Hilda **LAURENZANO**, Plaintiffs,

v.

Alvin H. **EINBENDER**, David V. King, Bernard H. Barnett, Stanley Yarmuth, Milton M. Horne, Stanley A. Nabi, Solomon S. Dobin, Jack Horne, National Industries, Inc. and Retail Centers of the Americas, Inc., Defendants.

No. 65 C 1285.

United States District Court
E. D. New York.

Nov. 29, 1966.

---

Sidney B. Silverman, New York City, for plaintiffs.

Lawson F. Bernstein, New York City (I. Meyer Pincus, New York City, of counsel), for defendants other than Retail Centers.

Myron J. Greene, New York City (Millard & Greene, New York City, of counsel), for defendant, Retail Centers of the Americas, Inc.

## MEMORANDUM and ORDER

DOOLING, District Judge.

The allegations of the amended complaint, seeking to rescind two transactions, would, if true, appear to state a case under state law for breach of fiduciary duty owed to a corporation. The defendants, in effecting the formal corporate action involved in completing the transactions, solicited the votes of the corporation's shareholders through a proxy statement alleged to have been false and misleading, and the defendants allegedly caused the corporation, relying on the proxy material, to acquire a large amount of its own stock at an inflated cost. Plaintiffs invoke federal jurisdiction under the Securities Exchange Act of 1934, Sections 10(b), 14 (a), and 27 (15 U.S.C.A. §§ 78j(b), 78n (a), and 78aa) and the related regulations, 17 C.F.R. § 240.10b–5 and 14a–9.

Defendants' objection to jurisdiction is that the proxy solicitation was needless, since the majority vote needed for approval of the transaction was in hand without any proxy solicitation, and that, in consequence, any misrepresentations in the proxy material were not, in legal contemplation, the cause of the wrongs complained of.

Diversity of citizenship is not present, and, while Sections 12(2), 17 and 22(a) of the Securities Act of 1933 [15 U.S. C.A. §§ 77l, 77q, 77v (a)] are referred to in the complaint, it is not argued that they would support jurisdiction if the cited sections of the '34 Act fail to do so.

The motion to dismiss the action for want of jurisdiction must be denied.

The suit is brought by two stockholders suing derivatively on behalf of Retail Centers of the Americas, Inc. (Retail) and representatively on behalf of Retail's similarly situated stockholders. The defendants are Dobin and Horne, who owned about 985,000 shares—over 70 percent—of Retail's stock until the events complained of occurred; National Industries, Inc. (National), which on October 7, 1964, bought 690,100 shares of Retail stock from Dobin and Horne, giving National voting control of Retail; and individuals active in the managements of Retail and National.

Before October 7, 1964, Retail operated six stores, and National, through a subsidiary, controlled a group of three "closed-door membership" department stores (identified as G*E*S). The two companies were unrelated in ownership. On October 7, 1964, Dobin and Horne completed arrangements with National by which (i) Dobin and Horne sold to National just over 50 percent of the stock of Retail (690,100 shares); and (ii) Retail—then under the voting control of National—formally agreed to transfer two of its stores (separately incorporated as Buy-Rite Discount Centers, Inc.) to Dobin and Horne in redemption of the remaining twenty-odd percent (294,606 shares) of Retail's stock that they owned. On November 30, 1964, (iii) National agreed to sell G*E*S to Retail for $2,- 100,000 which Retail undertook to raise through a public offering of convertible debentures.

In both the transactions involving Dobin and Horne it appears that their stock in Retail was treated as worth $4 a share; the Dobin and Horne shares were not registered on any national securities exchange (see '34 Act, § 12, 15 U.S.C.A. § 78l). The remaining 375,000 odd shares of Retail were owned by the public and were registered on the American Stock Exchange. On October 7, 1964, the closing price of the registered stock on the Exchange was $6⅛.

The number of shares to be redeemed by Retail was fixed, the proxy statement asserts, by determining "the fair value of the assets" of Buy-Rite, dividing that value by $4 a share, and allocating that number of shares to the redemption transaction. The rest of the Dobin and Horne shares thus fell to be allocated to the sale transaction, at $4 a share; they amounted to 690,100 shares, 50.99 percent of Retail's stock. National paid only 29% of the purchase price on October 7, 1964; it was to pay the balance on or before July 7, 1965, and the 690,100 shares were transferred to a bank under a Collateral Security Agreement to secure payment of the balance of the purchase price. Dobin and Horne put the remaining 294,606 shares in escrow, and they were shorn of voting power, until the closing of the redemption transaction.

The agreement for the redemption of the 294,606 shares of Retail through a distribution of all the stock of Buy-Rite to Dobin and Horne required that the transaction be authorized and approved at a special stockholders' meeting of Retail. Since the sale price of G*E*S to Retail was admittedly not arrived at in arms-length bargaining, the G*E*S purchase agreement similarly required that the transaction be authorized and approved at a special stockholders' meeting of Retail. The issuance of the convertible debentures, too, required the approval of Retail's stockholders.

The proxy statement, mailed to the Retail stockholders on December 30,

1964, declared that, "The transaction * * * involving the acquisition * * * of the remaining shares of Messrs. Dobin and Horne in exchange for all of the stock of a corporation that * * * operates two of the * * * stores, is an integral part of the plan for the acquisition by National of the controlling interest in [Retail]. It is therefore deemed advisable that such transaction be submitted to a vote of the shareholders of [Retail] * * *." The proxy statement said further, "Since National is the owner of [G*E*S] shares and also holds the controlling interest in the Common Stock of [Retail], it is deemed advisable that this transaction should also be submitted to the shareholders of [Retail] * * *." The proxy statement noted that since the issuance of the convertible debentures was an integral part of the plan to acquire the G*E*S shares, "it is deemed advisable that this matter also be submitted to the vote of the shareholders" of [Retail].

The proxy statement advised the Retail stockholders that National owned just over 50 percent of Retail's stock beneficially and of record, that its stock-holdings sufficed to secure approval of all of the matters to be voted upon, and that National had advised Retail's management that it intended to vote favorably on each of the matters. The Retail stockholders were also advised that the 294,606 escrowed shares, still owned by Dobin and Horne, could not be voted.

At the special meeting, held January 14, 1965, National voted its shares for the various resolutions. Although 375,000 other shares were entitled to vote on the proposals, only the following votes additional to National's own vote were recorded:

| Transaction | For | Against |
|---|---|---|
| Acquire the 294,606 shares | 93,690 | 1,705 |
| Acquire G*E*S | 89,529 | 5,866 |
| Issue convertible debentures | 90,029 | 5,366 |

That is, roughly a quarter of the minority shares cast votes, and they voted overwhelming for the transactions.

The redemption transaction was closed on January 29, 1965, the G*E*S transaction was completed on February 1, 1965, and the debentures were duly sold.

Plaintiffs' complaint analyzes the transactions as a sale by Dobin and Horne of a bare majority of Retail's voting stock to National at less than market value, a redemption of the remaining twenty-odd percent of the Dobin and Horne stock at an excessive cost to Retail through National's exercise of its control over Retail (amounting, plaintiffs assert, to National's paying a premium for the Dobin-Horne control stock out of Retail's assets), and a sale of G*E*S to Retail at an excessive price (recouping most of National's cash outlay for the control stock). Plaintiffs had earlier started a state court suit for relief against the transactions, and that suit was dismissed when plaintiffs failed to furnish security, as required by the Court's order, pursuant to Business Corporation Law, McKinney's Consol.Laws, c. 4, § 627.

Plaintiffs' present case is rested jurisdictionally on allegations that the proxy statement was (a) false and misleading in stating (i) that the Board of Retail in determining the value of the Buy-Rite assets had obtained a written appraisal and "on the basis of such appraisal" was "satisfied that the fair value of the assets" approximately equalled book value ($1,178,427), whereas the appraisal was not completed until many months later; and (ii) that two outside expert firms were retained to assist the Board of Retail in reviewing the factors relevant to appraising G*E*S

and to the Board's conclusion that the fair value was $2,100,000, whereas the Board was committed to the terms of the transaction, and did not rely on the experts' reports; and was (b) false and misleading in failing to disclose (i) that the appraisal of Buy-Rite properties used "discounts" ranging from a low of 50 percent to a high of 95 percent, (ii) that the Buy-Rite stock was being sold to Dobin and Horne in return for their agreement to sell control to National, (iii) that the Buy-Rite stock was being sold at less than its fair value, and (iv) that Retail was paying too much for the G*E*S stock. The damage flowing from the allegedly misleading proxy material, plaintiffs allege, was that the misled minority stockholders did not sue to enjoin the transactions; plaintiffs, when they sued in state court, were dismissed as they would not have been if the proxy statement had been truthful, for a truthful proxy statement would have assured plaintiffs of being joined in their suit by stockholders owning $50,000 in value of stock; and the defendant directors themselves would not have approved the transactions had the proxy material made public the alleged improprieties.

Defendants contend that the outcome of the stockholders' meeting was a foregone conclusion: it was the fact, and was apparent to any minority stockholder who read the proxy statement, that National would have approximately a 65 percent voice at the meeting; and that National meant to vote for the transactions; in consequence, even if the proxy material were false and misleading, there would be no action based on a violation of Section 14 of the '34 Act because authorization of the transactions was not obtained by any deception or suppression in the proxy statement but by the exercise of National's self-sufficient voting power. Cf. J. I. Case Co. v. Borak, 1964, 377 U.S. 426, 431, 84 S.Ct. 1555, 12 L.Ed. 2d 423; Barnett v. Anaconda Company, S.D.N.Y.1965, 238 F.Supp. 766, 773–774. Defendants, in effect, argue that as a matter of law the charge of paragraph 10 of the complaint, that stockholder approval was procured by using false proxy material, is baseless.

The plaintiffs place reliance, similarly, on Section 10(b) of the '34 Act and Rule 10b–5 and on Sections 12(2) and 17 of the '33 Act, contending that alleged defects in the proxy material misled the corporation and its stockholders. Defendants answer that, as in the *Barnett* case (238 F.Supp. at 774 et seq.), so here, the alleged fraud was not the means by which the redemption transaction was brought about. Cf. Hoover v. Allen, S.D. N.Y.1965, 241 F.Supp. 213, 229–230.

It may be supposed that J. I. Case Co. v. Borak requires that the accused proxy material (whether considered in the perspective of Section 10 or Section 14 of the '34 Act) have a transactional function and not merely be randomly present in the context of the transaction with respect to which a remedy is sought. See O'Neill v. Maytag, 2d Cir. 1964, 339 F.2d 764, 767–768; Ruckle v. Roto American Corporation, 2d Cir. 1964, 339 F.2d 24, 29; Hooper v. Mountain States Securities Corporation, 5th Cir. 1960, 282 F.2d 195, 201–202; Schine v. Schine, S.D. N.Y.1966, 250 F.Supp. 822, 823; Simon v. New Haven Board & Carton Co., D. Conn.1966, 250 F.Supp. 297, 299; Eagle v. Horvath, S.D.N.Y.1965, 241 F.Supp. 341, 343–344; Kane v. Central American Mining & Oil, Inc., S.D.N.Y.1964, 235 F.Supp. 559, 563–564; New Park Mining Co. v. Cranmer, S.D.N.Y.1963, 225 F.Supp. 261, 264, 267 (25,000 share transaction); Textron, Inc. v. American Woolen Co., D.Mass.1954, 122 F.Supp. 305, 307–308. In the special form of an insistence upon proof of justifiable reliance in Rule 10(b)–5 cases List v. Fashion Park, Inc., 2d Cir. 1965, 340 F.2d 457, 462–464, emphasizes the same principle.

▮▮▮ Here the parties whose conduct is accused had the power to complete the transactions without any votes from others. Had no proxies been solicited, the transactions would nevertheless have been vulnerable if plaintiffs are right in saying that Buy-Rite was undervalued and G*E*S overvalued, and that by so manipulating values on the two transac-

tions National paid the premium for control out of Retail's assets, at the expense, *pro tanto*, of its minority stockholders, rather than out of National's own purse. The proxy material, so far as it is criticized for its failure to state—in substance—that the transactions were breaches of fiduciary duty (that is, it failed to acknowledge that the terms were unfair by stating that the prices were askew), can not be the basis of a Section 14 case. Section 14(a), (c) exacts candor of disclosure, not fairness of substantive terms, and phrasing an attack on unfairness of terms as a failure of the proxy material to acknowledge that unfairness does not transform the attack on unfairness of terms into a case of federal cognizance under J. I. Case Co. v. Borak: it is precisely that general transformation which O'Neill v. Maytag rejects, without discountenancing the idea that a suit for breach of fiduciary duty and a suit for breach of federal statutory duties of candor can at times involve coincident evidence and yield equivalent relief.

■ The proxy material went farther here, it is alleged, in affirmatively misrepresenting the independent appraisal procedures used in arriving at the transactional values. Exiguous as such claims may appear, particularly in the all but muted way in which those notes are struck in the amended complaint, they must be taken as adequately charging fraudulent solicitation by representing that a confidence-inspiring situation existed when it did not exist. And so the question is whether the proxy material had in this case a transactional function. Plaintiff relies on three effects of the alleged failure of truthful disclosure— that truthful proxy material would have begotten prompt injunction suits, assured the joinder of stockholders owning $50,-000 of stock in the state court suit, and inhibited the defendant directors from approving the transactions. It is more than doubtful that the first two effects, essentially collateral effects, are relevant. The misstatements and their effects, it would appear, should be related to the corporate context in which proxy material functions as such and not to the outer range of their effect on the resort to legal remedies.

■ A limited but real proxy-solicitation function for the allegedly false proxy material existed. The redemption agreement required stockholder approval and so did the G*E*S purchase agreement. The purpose may have been to secure a formally sufficient stockholders' vote and not to require a solicitation of proxies and, in consequence, the disclosures that the rules required. But National had agreed to obtain approvals at a special meeting of stockholders, and a meeting could be held only on notice to all stockholders. It was not at the time impossible for a company the stock of which was listed on the American Stock Exchange to hold a meeting of stockholders without soliciting any proxies and without supplying any information comparable to that set forth in a proxy statement; while Section 14(c) of the '34 Act had been passed, Regulation 14C (31 Fed.Reg. 262 (1966)) had not yet been adopted. It is not, however, to be assumed without evidence that the solicitation of proxies was a gratuitous and, therefore, purposeless and legally inert act. It may be that an unfavorable vote from the minority stockholders would have brought about modification or reconsideration of the transactions; in corporate circles, consensus can be a desideratum. It may be that a value was perceived and sought in just such a favorable vote as was obtained from the one-quarter of the minority stockholders who mailed in their proxies. Such seemingly pointless approbations have their uses, and even the record of disclosure itself may serve a range of useful purposes. Although the proxy solicitation was not a necessary or indispensable ingredient of the execution of the transactions, it was calculatedly infused into the matrix of the transactions; it cannot now be said as a matter of law that the solicitation was not an integral part of the transactions and that it was functionless in the consummation of the

transactions. But cf. The Supreme Court, 1963 Term, 1964, 78 Harv.L.Rev. 143, 299.

▮▮▮▮ The proxy regulations are directed to requiring disclosures that will assure that stockholders' meetings are meetings of informd parties in interest and are meetings informationally competent to deliberate on corporate matters and decide them by stockholder vote. The meeting does not become nugatory and dispensable because one stockholder owns enough shares to carry any resolution and can be expected to vote in favor of his own resolutions. The vote is not legally predetermined simply because it seems practically predictable. The meeting must be held; the stockholders must receive a truthful proxy statement (Rule 14a–9), or—today—a truthful information statement (Rule 14c–6) if proxies are not solicited. If proxies are solicited, the stockholders have a statutory right to a truthful proxy statement. Misleading proxy material impeaches the validity of the meeting, its efficacy as a meeting. A majority stockholding cannot legitimate a meeting based on misleading information by reference to its possession of votes that would suffice to end debate. The misleading proxy material deprives the meeting, and the majority stockholder, of the expressions of view and the votes that would have ensued upon truthful disclosure; it is not legally possible to decide what legal consequences flow from the informational defects in the meeting by asserting that the meeting would have ended in the same resolutions no matter what the views or votes of the minority. That is not necessarily the fact and it cannot be the resolving principle of law.·

Much must depend on the facts. There is a great deal to indicate that plaintiffs' description of the transactions scarcely reflects their real terms, and the papers leave it uncertain whether there was in truth a single unitary but complex transaction or as many as four distinct transactions. Perhaps it will develop that the proxy solicitation was in fact of no sig-

nificance. It cannot now be said, for all its seeming pointlessness, that the proxy solicitation did not have a function corresponding with that of any other proxy solicitation and that the consequences flowing from falseness in it differed in kind from those in cases in which the solicitation of proxies was considered. necessary and indispensable.

List v. Fashion Park, Inc., 2d Cir. 1965, 340 F.2d 457, would appear to preclude a Section 10(b) and Rule 10b–5 claim distinct from a Section 14 claim in the precise factual situation here presented. The second cause of action would not therefore appear to add any legal vitality to the amended complaint.

Accordingly, on the motion of the defendants, other than Retail Centers of the Americas, Inc., to dismiss for want of jurisdiction, it is

Ordered that the motion is denied.

▮▮▮ It appears that the foregoing Order involves a controlling question of law, that is

Where a transaction between a majority stockholder and a corporation, which was authorized and approved at a stockholders' meeting of the corporation, is challenged on the ground that the proxy material for the meeting was false and misleading, may minority stockholders in the absence of diversity, maintain an action for rescission (or other relief) in a United States District Court under Sections 14 and 27 of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78n(a) and 78aa), or must the action be dismissed on the ground that the transaction was not brought about through use of the proxy material but through exercise of the voting power of the majority stockholder? Cf. Barnett v. Anaconda Company, S.D.N.Y.1965, 238 F.Supp. 766.

and that as to this question there is substantial ground for difference of opinion, and that an immediate appeal from the Order may materially advance the ultimate termination of the litigation.