**Hugh G. PETERSEN, Jr., Plaintiff,**

v.

**FEDERATED DEVELOPMENT COMPANY et al., Defendants.**

**No. 73 Civ. 5465 (CSH).**

United States District Court, S. D. New York.

June 15, 1976.

Windels & Marks, New York City, for plaintiff.

Marshall, Bratter, Greene, Allison & Tucker, New York City, for defendant SMR Holding Corp.

Cahill, Gordon & Reindel, New York City, for individual defendants.

Wender, Murase & White, New York City, for defendant Federated Development Co.

### MEMORANDUM AND ORDER

#### Memorandum

HAIGHT, District Judge.

The defendants have brought a motion for summary judgment directed at the two remaining counts of plaintiff's second amended complaint. Previously, by Memo-

randum of Judge Bonsal dated November 26, 1974 and reported at 387 F.Supp. 355 (S.D.N.Y.1975), and Order dated December 20, 1974, plaintiff's three other causes of action were dismissed on the pleadings, and his motions for class certification and appointment of a receiver denied. In opposing the instant motion, plaintiff also seeks "reinstatement" of the dismissed portions of his suit on the grounds that the Court misconstrued the thrust of his second amended complaint, and further, that recent decisions of the Court of Appeals for the Second Circuit are said to warrant the re-opening of certain portions of Judge Bonsal's decision.

For the reasons set forth below, defendants' motion for summary judgment is granted, and plaintiff's requested relief is denied.

## The Parties

Defendants in this action include Federated Development Company ("Federated"), a New York real estate investment trust whose shares were traded on the New York stock exchange; the individuals comprising its board of trustees immediately prior to and following a September, 1973 tender offer for control of Federated, successfully undertaken by SMR Holding Corporation ("SMR"), a privately-owned Delaware corporation controlled by one Charles E. Hurwitz ("Hurwitz"); and SMR. Plaintiff is a sizeable Federated shareholder, and had, at a time preceding the activities complained of herein, served on Federated's board of trustees.

Since Federated's genesis in the 1960s, members of the stock brokerage house of Loeb, Rhoades & Co. ("LR"), particularly one John L. Loeb ("Loeb"), held a substantial, though minority, block of Federated stock, placed several LR officers on its board of trustees, and appear to have exercised considerable influence over the management of the company. Although key participants in plaintiff's averred fraudulent scheme, neither LR nor its members, save for those on Federated's board during 1973, are defendants herein.

## Background

Accepting as I must for summary judgment purposes plaintiff's rendition of the facts, it appears that in March, 1973 Hurwitz of SMR approached Federated with a proposal that the two companies be "combined", such reorganization to be effected through an SMR tender for a majority of outstanding Federated shares. Although Federated's management found the plan unacceptable in light of the fact that they would thereby become minority shareholders, the idea appealed to the LR group which was allegedly in need of fresh capital. The LR group threatened to encourage the tender offer unless another means of transfusing funds to them were found, and consequently, the "Boston agreement" was stuck between Loeb and William T. Golden ("Golden"), Federated's Chairman, pursuant to which Federated would initiate a plan of liquidation. According to plaintiff, this approach was preferable for all concerned since the book value of Federated stock was somewhat higher than the price per share of the contemplated tender offer.

Having ostensibly rebuffed SMR, Federated as a first step towards its own liquidation, made a tender offer on March 26 for its own stock at $8.00 per share, ultimately reducing the number of its outstanding shares by 216,124. Plaintiff notes that this tender facilitated the SMR bid by lessening the number of outstanding shares and had the effect of increasing the book value of the remaining Federated stock. It is not averred that Federated's shareholders were notified of the "Boston agreement" at this time, or of the decision to liquidate the company.

Plaintiff maintains that LR's need for capital was so pressing, however, that it could not await the orderly liquidation of Federated, and thus, in contravention of the advice of each party's counsel to shut off communications for a six-month period, continued to discuss with Hurwitz and his associates the possibility of an SMR takeover bid. More specifically, plaintiff avers that during July of 1973, Hurwitz solicited

Lehman Bros. for their assistance in the contemplated takeover bid, assuring the investment banking firm that the Federated management and the LR group would cooperate in such a venture. Additionally, plaintiff claims that Hurwitz and the LR group met on other occasions during that summer for the purpose of preparing an upcoming tender offer.

The second amended complaint pleads that on or about September 17, LR presented to Federated's board the tender offer it had concocted with Hurwitz, the terms of which were intended to insure maximum "insider" participation (i. e. the LR and Federated management groups) to the detriment of the "outsider" shareholders. Further, plaintiff avers such a scheme was motivated solely for the benefit of the LR group and in contravention of the interests of the shareholders who would have been best served by implementation of the liquidation plan previously embarked upon. By abandoning the "Boston agreement", casting their lot with SMR and tendering their own shares, Federated's trustees are charged with a breach of their fiduciary duty.

On September 19 SMR announced over the Dow Jones news ticker a tender offer for 800,000 Federated shares (approximately 50.01% of the company's outstanding stock) at $12.25 per share. Simultaneously, a press release containing news of the tender was issued to the major wire services, the Wall Street Journal (which published a story on the offer on September 20), the New York Times, and to some 59 major brokerage houses. Additionally, the firm of D. F. King & Co., Inc. was retained to respond to inquiries concerning the tender offer, which by its terms was to expire at midnight on September 29.

Although SMR had been provided with a Federated shareholders list, no use was made of same until September 21, when, at Federated's insistence, copies of the tender offer were mailed to the shareholders at SMR's expense. The Offer to Buy contained the following relevant provision:

"PURPOSE OF OFFER"

"5. *Anticipated Acquisition of Control by SMR.*

SMR intends through this Offer to acquire sufficient Shares to give it working control of the Company. It intends to seek majority representation on the Company's Board of Trustees and to call a special meeting of shareholders of the Company for that purpose. SMR has no present plans to liquidate the Company, but would expect to continue the businesses, in which the Company is now engaged, of reinsurance and of disposing of the Company's real estate properties. SMR may seek, among other possibilities, to merge or consolidate the Company with SMR itself. The holders of Shares not purchased pursuant to this Offer would be affected by any such merger . . . ."

The Offer to Buy also disclosed the March negotiations between SMR and Federated, but stated that they had been terminated at that time, SMR having determined to make no tender offer.

Also on September 21, Federated shareholders were sent a letter from Golden advising them that the tender offer was being studied by Federated's board, which would issue its recommendations on September 24. As promised, a subsequent communication was distributed to Federated shareholders, in which the trustees stated that they believed the tender would be successful, and added:

". . . [W]ithout endorsing SMR Corporation, its principals, or the tender program the Trustees have concluded that they will tender their shares. (It is expected that their families and associates will do the same.) Loeb, Rhoades & Co. and its partners and members of their families as of March 8, 1973 owned 292,-161 shares or 18.3% of the shares presently outstanding; Federated has been advised that these shares will be tendered."

This letter also stated that the trustees had adopted a resolution approving liquidation of the Company. Although it was further noted that the book value of Federated was "in excess of $16 per share," it cau-

tioned that such a sum might not be realized upon liquidation.[1]

Plaintiff contends that these two communications were intended to and did in fact have the effect of forestalling "outsider" shareholders from tendering their shares by (1) causing them to await the board's tardy recommendation during an extremely short tender period and (2) deceiving them into believing that by not tendering they had a realistic prospect of enjoying a greater return on their shares through the plan of liquidation. Plaintiff further avers that during this period the LR group suborned Federated's trustees into abandoning the "Boston agreement", and acquiescing in the scheme to defraud the "outsider" shareholders, thereby violating their fiduciary duty.

At the expiration of the offering period 1,396,602 of 1,599,714 shares, or 88% of outstanding Federated stock, had been tendered, and such offers were accepted on a pro rata basis as required by Section 14(d)(6) of the Securities Exchange Act of 1934 ("Exchange Act" or "1934 Act"), 15 U.S.C. § 78n(d)(6). Plaintiff herein failed to participate because he had departed the country on September 17 and only returned on the evening of October 3, and during his absence left no one responsible for forwarding his mail, or with authority to act in such matters on his behalf. The fact that plaintiff was wholly unaware of the communications described above until the evening of October 3, 1973 is uncontested.

On November 1, 1973, SMR as the controlling Federated shareholder formally requested a special shareholder meeting, solely to enact its proposal to increase the board of trustees from eight to seventeen, the nine new trustees being SMR nominees. As required by Section 14(c) of the Exchange Act and Rule 14(c)(6) promulgated thereunder, an information statement dated December 14, 1973 setting forth the SMR proposal was filed with the SEC and mailed to all Federated shareholders, stating,

among other things, that the purpose of the resolution expanding the board of trustees was to give SMR "working control" over Federated, and revealing the March, 1973 negotiations, the particulars of SMR's financing of the September, 1973 tender offer and SMR's intentions with regard to its future operation of Federated. No proxies were solicited pursuant to this special shareholder meeting.

By letter dated November 23, 1976, Federated's trustees advised the shareholders that the liquidation plan was no longer a viable option in light of notification from SMR that it would vote its majority interest against such a course of action. The correspondence further stated that Lehman Brothers had been retained by Federated to counsel the non-SMR shareholders on the fairness of any future merger or reorganization of Federated.

A further tender was made by Federated for 150,000 of its own shares on December 21, 1973 at $7.00 per share; plaintiff avers that 236,153 shares were accepted, so as to allow for the complete divestment by the LR group of its remaining Federated shares.

The special shareholder meeting was held on January 7, 1974, the proposal adopted and the SMR nominees elected. No other business was considered at that meeting. The directors so elected served until expiration of their terms on August 21, 1974, whereupon seven of them were reelected notwithstanding the disclosure of the averments made in the instant suit which had been filed in December, 1973.

Federated made a final tender offer for its remaining shares on September 16, 1974 at $5.00, and subsequently, the stock was de-listed from the New York Stock Exchange.

*The Complaint*

Plaintiff's original complaint, filed in December, 1973, was amended twice: in Janu-

---

1. October 5 was fixed as the record date for shareholders entitled to vote at the shareholder meeting at which the plan of liquidation would be voted upon. Plaintiff asserts that this date was chosen because it (1) would ensure against SMR granting any extensions of its offer and (2) came at a time when Hurwitz would vote his majority interest against such a proposal.

ary, 1974 to aver its claims derivatively on behalf of the company, and again in September, 1974 to include a claim under Section 14(e) of the Exchange Act, 15 U.S.C. § 78n(e). As such, the second amended complaint set forth five counts and sought class action certification and the appointment of a receiver with respect to the proceeds of the September, 1974 tender offer. The first and second causes of action averred violations of Section 10(b) and Rule 10(b)(5) of the Exchange Act relating to the September 19, 1973 and December 21, 1973 tender offers respectively. Judge Bonsal dismissed the first claim on the pleadings because plaintiff failed to allege that he was either a purchaser or a seller of securities in connection with those tender offers, and the fraud he averred, according to his pleadings, had been consummated. Furthermore, plaintiff's attempt to advance the second cause of action, relating to the December, 1973 tender offer, in a derivative capacity was denied because the complaint failed to aver injury to Federated resulting from that transaction. The fifth claim, brought by plaintiff shareholder as a third party beneficiary, complained of the breach of contract induced by defendants when, contrary to its listing agreement with the New York Stock Exchange, Federated held a shareholder meeting on January 7, 1974 without soliciting proxies. This cause of action was dismissed because "it failed to derive from a common nucleus of operative fact" 387 F.Supp. at 360, and was therefore not within the pendent jurisdiction of the federal court. Plaintiff's motion for class certification was denied for failure to demonstrate numerosity with respect to the owners of the remaining non-tendered Federated shares, and the motion for appointment of a receiver was denied since the requisite showing of necessity had not been made.

The third cause of action, arising from the two communications sent shareholders during the September, 1973 tender offers, averred violation of Section 14(e) of the Exchange Act,[2] which prohibits misstatements or material omissions made in connection with a tender offer. In essence, plaintiff's claim under Section 14(e) is that defendants employed an improperly short tender offer period with misleading communications, thereby dissuading "outsider" shareholders from participating, and restricting the benefits of the offer to the informed "insider" group. Judge Bonsal noted that while plaintiff had stated a cause of action under Section 14(e), he added, "Whether plaintiff was actually in a position to take advantage of SMR's offer cannot be determined on the basis of the pleadings." 387 F.Supp. at 359.

Plaintiff's fourth cause of action avers violations of Section 14(c)[3] and Rule 14(c)(6)[4]. The statutory provision requires that unless proxies are solicited by a company, its management must, prior to a meeting at which corporate action will be taken,

**2.** Section 14(e) states:

"It shall be unlawful for any person to make any untrue statement of material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders . . ."

As a non-tendering shareholder, plaintiff has standing to assert a damage claim against defendants for violation of Section 14(e), *Chris-Craft Industries v. Piper Aircraft Corp.*, 480 F.2d 341 (2d Cir.), cert. den., 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973).

**3.** Section 14(c) states:

"Unless proxies, consents, or authorizations in respect of a security registered pursuant to section 78l of this title are solicited by or on behalf of the management of the issuer from the holders of record of such security in accordance with the rules and regulations prescribed under subsection (a) of this section, prior to any annual or other meeting of the holders of such security, such issuer shall, in accordance with rules and regulations prescribed by the Commission, file with the Commission and transmit to all holders of record of such security information substantially equivalent to the information which would be required to be transmitted if a solicitation were made, but no information shall be required to be filed or transmitted pursuant to this subsection before July 1, 1964."

**4.** Rule 14(c)(6) states:

file with the SEC and distribute to shareholders an information statement containing the same facts as would have been required had proxies been solicited.

Rule 14(c)(6) prohibits such information statements from making misstatements or from failing to state all material facts "necessary in order to make the statements therein not misleading." Although not entirely clear from the second amended complaint, it seems that the crux of this claim is that defendants violated Section 14(c) and Rule 14(c)(6) by failing to disclose in their December 14, 1973 information statement the full particulars of the negotiations between Hurwitz, LR and certain Federated employees which are alleged to have occurred in the spring and summer of 1973, in violation of the "Boston agreement", and which culminated in the successful September 19, 1973 tender offer. The omissions and/or misstatements complained of in this count would appear to be identical with those complained of concerning the September, 1973 tender offer literature. Plaintiff asserts that this material omission induced shareholders to view favorably the transfer of corporate control. Judge Bonsal ruled that the fact that the proposal could not have been defeated did not necessarily foreclose plaintiff from demonstrating the required causal relationship between the improper information statement and the transfer of control, and thus declined to strike the fourth cause of action on the pleadings.

*The Pending Motions*

Taken together, the motions at bar require this Court to determine if any portion of Judge Bonsal's opinion should be disturbed, and to pass upon the propriety of granting the defendants' summary judgment on the two counts not stricken from the second amended complaint.

A. *Plaintiff's "Motion to Reinstate".*

Plaintiff requests that this Court "reinstate" all dismissed portions of his second amended complaint on the ground that Judge Bonsal "misconceived" his claims and placed "an unduly restrictive interpretation" upon them. With respect to the first and second claims, averring violation of Section 10(b) and Rule 10(b)(5), plaintiff further contends that the Second Circuit's recent opinions in *Green v. Sante Fe Ind., Inc.,* 533 F.2d 1309 [Current] CCH Fed.Sec. L.Rep. ¶ 95,447 (2d Cir. 1976) and *Marshel v. AFW Fabric Corp.,* 533 F.2d 1277 [Current] CCH Fed.Sec.L.Rep. ¶ 95,448 (2d Cir. 1976) mandate reconsideration of their dismissal. This Court declines the invitation.

■ The "law of the case" doctrine as it has evolved in the federal courts provides that where a court has enunciated a rule of law to be applied in a case at bar, it establishes the law which will normally apply to the same issues in subsequent proceedings in that case. The doctrine is not inexorable or absolute, but is based on the policy of judicial economy:

> "[W]here litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." *Zdanok v. Glidden Company-Durkee Famous Foods Div.,* 327 F.2d 944 (2d Cir.), *cert. den.,* 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964).

"(a) No information statement shall contain any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the same meeting or subject matter which has become false or misleading.

"(b) The fact that an information statement has been filed with or examined by the Commission shall not be deemed a finding by the Commission that such material is accurate or complete or not false or misleading, or that the Commission has passed upon the merits of or approved any statement contained therein or any matter to be acted upon by security holders. No representation contrary to the foregoing shall be made."

■ A frequent application of the "law of the case" doctrine arises in the context, such as the present, where a judge sitting in the same court and on the same case as a judge of coordinate jurisdiction is asked to review his predecessor's decisions. While it is undoubted that the power to depart from a coordinate judge's rulings exists, *Dictograph Prods. Co. v. Sonotone Corp.*, 230 F.2d 131 (2d Cir. 1956); *Perrone v. Pennsylvania R. Co.*, 143 F.2d 168 (2d Cir. 1944), it is equally undisputed that such a departure from the law of the case requires a "clear conviction of error." *Johnson v. Cadillac Motor Car Co.*, 261 F. 878 (2d Cir. 1919). See also *White v. Higgins*, 116 F.2d 312 (1st Cir. 1940).

■ With regard to the dismissed fifth cause of action (defendant's averred breach of listing agreement with the New York Stock Exchange) and the denial of the motion for class action status, plaintiff advances no new facts or cases which would justify a re-examination of Judge Bonsal's decision, and consequently, this Court will not reconsider those issues.

As to the second amended complaint's first and second claims, plaintiff urges that *Green, supra,* and *Marshel, supra,* render their dismissal clearly erroneous. Such is not the case. Judge Bonsal's holding was based on the fact that plaintiff lacked standing individually or as a class representative to complain of the averred fraud culminating in the September 19, 1973 tender offer because he failed to meet the purchaser-seller requirement of Section 10(b). Plaintiff, of course, could not assert this claim derivatively, since Federated was neither a purchaser or seller of its own securities with respect to SMR's September, 1973 cash tender.

The second claim of the complaint, averring violation of Section 10(b) stemming from the December 21, 1973 tender offer was dismissed for plaintiff's failure to fulfill the purchaser-seller requirement, and although Federated had been a buyer of its own shares, Judge Bonsal denied plaintiff the right to assert this cause of action derivatively because the complaint failed to plead damage to the company resulting from the transaction.

*Green, supra,* and *Marshel, supra,* held that a violation of Section 10(b) was pleaded when majority shareholder-defendants, though technically complying with State law, arranged to merge their companies into other entitles which they controlled for no other purpose than to "squeeze out" minority shareholders on terms which were alleged to be grossly unfair. Whatever the impact these cases may have on the ever-growing reach of Section 10(b), and whatever may be their continuing vitality in light of *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), (44 U.S.L.W. 4451), it is clear that they have no bearing on the basis for Judge Bonsal's dismissal of counts one and two. Neither *Green* nor *Marshel*, expressly or by implication, speak to the purchaser-seller requirement of Section 10(b); indeed, since Judge Bonsal's 1974 ruling the most relevant new development in this area is the Supreme Court's endorsement of the *Birnbaum* rule[5] in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), firmly supporting Judge Bonsal's ruling. Consequently, the Court finds no merit in the contention that recent cases justify the reconsideration of the previous holding in this action.

### B. Violation of Section 14(e).

■ In order to prevail on his Section 14(e) claim, plaintiff must demonstrate that the actions of the defendants caused the damage complained of. *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). A non-tendering shareholder has standing to assert this claim, *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937 (2d Cir. 1969); however, since plaintiff advances this claim

---

**5.** *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.), *cert. den.*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952).

in his individual capacity only,[6] he must establish that he acted or refrained from acting, to his detriment, because of the allegedly misleading statements and/or omissions of the September 21 and 24 communications to shareholders. Since defendant's uncontroverted Rule 9(g) statement indicates that plaintiff only tendered his shares on October 3 or 4, his ability to establish the requisite causal relationship depends upon whether he can legitimately claim to have been affected by the tender offer literature which, in turn, depends upon whether his contact with the offending material came at a time when he could have effectively acted upon it.

■ Although often criticized,[7] the federal statutory provisions relating to tender offers do not prescribe either a maximum or minimum length of offering period. However, the effect of Section 14(d)(6) is to create a minimum ten day offering period where, as here, the tender is for less than the total number of outstanding shares.

To be effective, a tender offer must comply with Rules promulgated by the SEC; Rule 14(d)(1)(c) requires that certain specified information concerning the offer be filed with the SEC prior to the announcement. Briefly, this data consists of the name of the tenderer, the provision for the depositor's withdrawal of shares, date of the offer's expiration and the information required by Items 2(a), (c) and (e), 3, 4, 5 and 6 of Schedule 13D or a fair summary thereof. Although the papers do not discuss this SEC filing, plaintiff does not aver that the offer was ineffective because of non-compliance with this requirement.

Once Rule 14(d)(1)(c) has been met, Section 14(d)(6) gives the offeror considerable latitude in determining the method of making a tender bid; thus, the language of that provision speaks of the date of the offer as the date on which the "offer or request or invitation are first published or sent or given to security holders." In the instant case, the announcement triggering the running of the ten day period was the publication of the offer over the Dow Jones news tape on September 19, 1973.

■ In computing the requisite ten day period, September 19 should be excluded, and September 20 counted as day one because,

6. Although the overriding purpose behind Section 14(e) is "the protection of the investing shareholder who must make an informed investment decision from the data contained in the tender offer", *Wulc v. Gulf and Western Industries, Inc.*, 400 F.Supp. 99, 104 (E.D.Pa. 1975), see also *Sargent v. Genesco, Inc.*, 492 F.2d 750 (5th Cir. 1974), it has been held that such a claim may be raised by a shareholder on behalf of a target corporation. *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937 (2d Cir. 1969).

Plaintiff herein purports to bring this action in both an individual and derivative capacity; however, his papers do not address the issue of the propriety of his seeking to recover personally against Federated, and simultaneously, prosecuting a claim on behalf of Federated. This potential conflict of interest has been recognized by the courts in this jurisdiction, with the result that plaintiff must, on occasion, choose between the pursuit of his personal interest and that of the corporation. See *e. g., Hawk Industries, Inc. v. Bausch & Lomb, Inc.*, 59 F.R.D. 619 (S.D.N.Y.1973); *Ruggiero v. American Bioculture, Inc.*, 56 F.R.D. 93 (S.D.N.Y.1972). See also, *Emle Ind., Inc. v. Patentex, Inc.*, 478 F.2d 562 (2d Cir. 1973). Since plaintiff ignores this substantial question and has made no showing that he can "fairly and adequately represent the interests of the shareholders . . . in enforcing the right of the corporation" as required by Rule 23.1, F.R. Civ.P., it must be assumed that he presses the Section 14(e) claim in his individual capacity only.

This conclusion is buttressed by the fact that the Section 14(e) claim, added by way of a second amendment to the complaint, does not expressly aver damage to Federated as set forth in the third cause of action. Moreover, the memorandum in support of plaintiff's position speaks only of the injury suffered by Petersen personally, and makes no mention of damage to Federated as a result of the change of ownership of its stock.

7. It has been recently noted that the absence of such regulation permits "Blitzkrieg" or "Saturday Night Special" tender offers. See *e. g.*, Robinson, "Tender Offers: Some Facts and Fancies", N.Y.L.J., May 18, 1976, p. 1, col. 2. In recognition of this potential hazard the New York Stock Exchange guidelines recommend an offering period of 30 days, but in no event less than ten days. See NYSE Company Manual at A–179, 180.

"[W]hen the period allowed for doing an act is to be reckoned from the making of a contract, or the happening of any other event, the day on which the event happened may be . . . excluded from the computation." *Burnet v. Willingham Loan & Trust Co.*, 282 U.S. 437, 439, 51 S.Ct. 185, 186, 75 L.Ed. 448 (1931).

See also *Joint Council Dining Car Employees Local 370 v. Delaware L. & W. R. Co.*, 157 F.2d 417, 421 (2d Cir. 1946); *Stella v. Graham-Paige Motors Corp.*, 132 F.Supp. 100 (S.D.N.Y.1955), remanded on other grounds, 232 F.2d 299 (2d Cir.), *cert. den.*, 352 U.S. 831, 77 S.Ct. 46, 1 L.Ed.2d 52 (1956). This general rule has been recently applied to the computation of time under the statute of limitations provision of the 1934 Act (Section 13). *Morse v. Peat, Marwick & Mitchell*, [Current] CCH Fed.Sec.L. Rep. ¶ 95,492 (S.D.N.Y., April 5, 1976).[8]

■ Assuming then that day one of the ten day period is September 20, defendants by setting the expiration for September 29 at midnight, complied with the ten day period. Consequently, plaintiff's claim for violation of Section 14(e) must fail since in no event could he have acted to his detri-

ment upon defendant's allegedly misleading communications, thereby establishing the required causal connection between the averred violation and the injury complained of.[9]

## C. Violation of Section 14(c) and Rule 14(c)(6).

■ Plaintiff's fourth cause of action avers violations of Section 14(c) and Rule 14(c)(6) in that the information statement filed and distributed by certain defendants, prior to the special shareholder meeting at which Federated's board of trustees was expanded to include a majority of SMR nominees, was defective.[10] It would appear that plaintiff avers that the information statement was misleading because it omitted disclosure of the full course of prior dealings between Federated, SMR and the LR group, thereby causing shareholders to "approve", or at least fail to block, a damaging transfer of corporate control.

In their motion to dismiss on the pleadings, defendants assailed this claim solely on the ground that since SMR had majority shareholder control, plaintiff would be unable under any set of circumstances to es-

---

**8.** This method is distinguished from that utilized when determining whether events occur "within any period of a given length," such as the purchase and sale of securities for purposes of determining whether Section 16(b) has been violated. In such cases "a period the first and last days of which each include the twenty four hours from midnight to midnight, and the last day of which is the second day prior to the date corresponding numerically to that of the first date of the period in the sixth succeeding month . . ." *Colonial Realty Corp. v. MacWilliams*, 512 F.2d 1187 (2d Cir.), *cert. den.*, 423 U.S. 867, 96 S.Ct. 129, 46 L.Ed.2d 96 (1975).

**9.** See *e.g., Pierre J. LeLandais & Co., Inc. v. MDS-Atron, Inc.*, 387 F.Supp. 1310 (S.D.N.Y. 1974), *aff'd* in pertinent part (2d Cir. May 5, 1976) (Dkt. No. 75–7108), where a Section 14 claim was dismissed as to a plaintiff shareholder ("ITNR") for lack of causation when it was shown that the offending proxy material was not forwarded to ITNR in time for it to act timely upon it.

**10.** As with plaintiff's claim under Section 14(e), the second amended complaint purports to bring this cause of action derivatively and indi-

vidually and thus raises the same threshold issue of the propriety of a single plaintiff seeking both a personal recovery from the corporation and a recovery for the corporation. Again, the Court deems this claim as having been raised solely on Petersen's behalf since on the basis of the *Ruggiero, supra,* rationale it doubts the wisdom of allowing plaintiff in a single complaint and utilizing a single attorney to split his causes of action between those brought derivatively and personally.

Moreover, the damage averred to have befallen Federated as a result of the faulty information statement apparently consists of an "illegal" transfer of corporate control, which led to the failure to liquidate Federated and, in turn, a decrease in value of the market price of Federated stock. As pleaded in this action, the decline in market price of corporate shares and the decision not to liquidate the company do not constitute "damages" to Federated within the meaning of the 1934 statute. See *e. g., Sargent v. Genesco Corp.,* 492 F.2d 750 (5th Cir. 1974). For these reasons, the claim under Section 14(c) is treated as having been brought for recovery by plaintiff alone.

tablish the requisite causal connection between violation and injury, since adoption of the resolution was inevitable. Judge Bonsal rejected this contention as a matter of law, noting that Schlick v. Penn-Dixie Cement Co., 507 F.2d 374 (2d Cir. 1974), cert. den., 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975) and Laurenzano v. Einbender, 264 F.Supp. 356 (E.D.N.Y.1966), aff'd, 448 F.2d 1 (2d Cir. 1971) hold that the numerical impossibility of a plaintiff's defeating a corporate resolution is not necessarily fatal to his ability to establish causation. Consequently, while Judge Bonsal may have been skeptical of plaintiff's ultimate ability to establish this element of the offense, he felt obliged, on the face of the pleadings, and against the plainly erroneous legal attack upon it by defendants, to let the Section 14(c) stand, at least pending discovery.[11]

Since the resolution of defendants' motion to dismiss on the pleadings, additional facts have been obtained pursuant to discovery, and the present motion for summary judgment has produced further documentation. On the basis of the papers and data now before the Court, I find that plaintiff cannot fulfill the causation requirement with respect to the averred violation of Section 14(c).

The test for causation in the context of Section 14 has been enunciated in Schlick v. Penn-Dixie Cement Co., supra :

"Both types of causation must be shown in order to state a Section 14(a) claim: transaction causation to show a violation of the law from which appellant may recover, and loss causation to show damages." 507 F.2d at 382.[12]

Judge Oakes further refined those terms, stating that in order to satisfy the causation requirement in an omission case,

"[T]here would have to be a showing of both loss causation—that the misrepresentations or omissions caused the economic harm—and transaction causation—that the violations in question caused the appellant to engage in the transaction in question." 507 F.2d at 380.

■ Finally, the acts or omissions which are said to form the violation must, under the Schlick prescription, be " 'an essential link in the accomplishment of the transaction,' " 507 F.2d at 383, which plaintiff avers caused the ultimate loss.

■ Applying the above test to the instant case, it appears that plaintiff's [13] theory is that the illicit January 7 meeting was instrumental in the abandonment of the plan of liquidation, thereby causing the market value of his Federated stock to drop.[14]

11. Defendants, in their motion for summary judgment, have mounted an equally unavailing attack upon plaintiff's Section 14(c) claim. Characterizing that claim as one for declaratory relief only, and noting that the terms of the SMR directors elected at the January 7, 1974 meeting have expired, defendants, relying on Browning Debenture Holders' Committee v. DASA Corporation, [Current] CCH Fed.Sec.L. Rep. ¶ 95,310 (S.D.N.Y.1975), argue that the cause of action is moot.

While the issue may not be entirely free from doubt, this Court finds that the Section 14(c) violation in the second amended complaint avers money damages to plaintiff, and as such, cannot be dismissed as moot.

12. This formulation is made explicitly applicable to claims under 14(c) in a later passage in the opinion, 507 F.2d at 383.

13. It should be noted at the outset that Petersen is in a particularly poor position to complain of omissions from the information statement since he was plainly aware of the nondis-

closures complained of. This fact is evidenced by his filing of this complaint several weeks prior to the special shareholder meeting. The Court assumes, though, that plaintiff may validly complain of loss in value of his Federated stock attributable to the failure of other shareholders to take action against the tainted transfer of control.

14. It might be noted that this pleading is not entirely consistent in that plaintiff has, under his Section 14(e) claim, characterized the liquidation plan as a "smokescreen", and yet takes the new Federated management to task for depriving the shareholders of an opportunity to actually implement the plan. To the extent that plaintiff, under his Section 14(c) claim advances a different theory of damages than that set forth above, the Court finds that it has not been pleaded with sufficient particularity. See Oleck v. Fischer, 401 F.Supp. 651 [Current] CCH Fed.Sec.L.Rep. ¶ 95,332 (S.D.N.Y.1975).

Such a proposition cannot be maintained; as noted above, Federated management had notified its shareholders by letter dated November 23, 1973 that the liquidation proposal, initially approved by Federated's trustees, was no longer a possibility due to SMR's announced opposition, and its ability to veto such a plan through its majority control. The implementation of "working control" by SMR over Federated through the acquisition of majority representation on the board of trustees was not "an essential link in the accomplishment of the transaction." Put another way, the expansion of Federated's board of trustees, accomplished through the distribution of an allegedly deficient information statement, was not the cause of Federated's relinquishment of its "liquidation plan"; that proposed course of action was never meant to survive the transfer of majority shareholder control effected through the September, 1973 tender offer. Such fact was obvious to anyone who read the Offer to Buy in conjunction with the September 24, 1973 letter to Federated shareholders, since the plan of liquidation was advertised only as an alternative Federated was presenting to its shareholders in the event they chose not to participate in the SMR takeover. Both the Offer to Buy and the information statement made it plain that SMR had no intention to liquidate Federated and distribute to shareholders the proceeds from the sale of its assets.

*Conclusion*

Plaintiff's motion to reinstate the dismissed portions of his second amended complaint is denied and defendants' motion for summary judgment is granted. It is So Ordered.