**A. Henry FRICKE, Jr., Plaintiff,**

v.

**DAYLIN, INC., et al., Defendants.**

**No. 74 C 189.**

United States District Court,
E. D. New York.

Feb. 13, 1975.

and for a number of objecting stockholders were heard. In view of the objections raised, that hearing was adjourned at the request of counsel to afford an opportunity to determine whether the differences between the proponents and objectants could be resolved. The parties having subsequently reported to the court that no agreement could be reached, a further hearing was held November 6, 1974, at which additional information requested by the court was furnished and oral argument was heard from counsel supporting and opposing the proposed settlement.

Daylin, Inc., on whose behalf the action is brought, is a Delaware corporation having its principal place of business in Beverly Hills, California. It is listed on the New York Stock Exchange and has approximately 4,300 stockholders, only five of whom have interposed objections to the proposed settlement.[1] Daylin is principally engaged in the operation of an extensive chain of discount stores and concessions retailing pharmaceuticals, sundries, home improvement items, ladies' apparel and linens. Net sales and operating revenues of Daylin for fiscal 1974 were reported at $560.2 million.

The plaintiff stockholder, A. Henry Fricke, Jr., is a New York citizen residing in this district. The individual defendants are nine directors, constituting Daylin's board of directors, three of whom are also officers, and two officers who are not directors. All appear to be citizens of California.

*Plaintiff's Derivative Claim*

The complaint seeks to hold the defendant directors and officers liable for (1) making false and misleading state-

Rabin & Silverman, by I. Stephen Rabin, New York City, for plaintiff.

Rifkind & Sterling, by Howard Sterling, and Jennings Jay Newcom, Beverly Hills, Cal., for defendant Daylin, Inc.

Pomerantz, Levy, Haudek & Block, by Abraham Pomerantz, New York City, for individual defendants.

Donald Nemir, and Peter Hunt, San Francisco, Cal., for objectant David Nemir.

Sid Mannheim, Los Angeles, Cal., for objectant Selma Mannheim.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

This stockholder's derivative action is before the court on an application under Rule 23.1, F.R.Civ.P., for approval of a proposed settlement. By court order, and on notice mailed to all stockholders setting forth its terms, a hearing on the proposed settlement was held October 16, 1974, at which counsel for the parties

[1]. The five objecting shareholders are Warren Daane, Jr., Louis Gerber, Robert Green, Selma Mannheim and David Nemir. Gerber and Daane communicated their objections in letter form; the remaining three objecting shareholders appeared by counsel. Mr. Green's counsel later reported to the court that subject to a slight modification in the proposed settlement, Green was withdrawing his objections.

ments in a proxy statement sent to Daylin stockholders in December 1973, in violation of Sections 10(b) and 14(a) of the Securities Exchange Act of 1934, Section 17(a) of the Securities Act of 1933, and Securities and Exchange Commission Rules 14a–9 and 10b–5; and (2) waste and breach of fiduciary duty arising out of actions taken by them at board meetings on June 29 and October 15, 1973. As relief, plaintiff demands (a) an order setting aside the annual meeting of shareholders held in January 1974, requiring that a corrected proxy statement be circulated, and directing that a new meeting be held; and (b) damages in the amount of $1,650,500. In view of the settlement proposal, defendants have not as yet answered the complaint.

The plaintiff's claims relate to stock transactions which occurred in 1972 between Daylin and four of the named defendants. Those defendants are: Amnon Barness, chairman of Daylin's board of directors and of its finance committee, Max Candiotty, then president and a director of Daylin, and Arnold Siegel and Leon Beck, both officers of Daylin. In 1972, pursuant to a Key Employee Incentive Plan ("the Plan"), Barness and Candiotty each purchased 75,000 shares and Siegel 10,000 shares of Daylin's common stock at prices of $15 and $17.-50 per share. In accordance with the Plan, each purchaser issued to Daylin a 10-year recourse promissory note bearing interest at 4% per annum. Installment payments on the notes were to be made by the purchasers at stipulated times over the course of the 10 years.

In November 1972, a similar transaction took place with respect to common stock of Handy Dan Home Improvement Centers, Inc., 81% of which was owned by Daylin. Out of 34,500 shares of Handy Dan stock offered to Daylin officers, directors and employees, Barness purchased 2,100 shares, Candiotty 1,600 shares and Beck 300 shares at a price of $16.50 per share. Each purchaser paid $1.00 per share to Handy Dan and the balance of the purchase price was again covered by 10-year recourse promissory notes bearing interest at 5¾% per annum.

The claim of the false and misleading proxy statement in violation of the Securities Acts and rules is aimed at subsequent resolutions adopted by the boards of directors of Daylin and Handy Dan which substantially altered the terms of the stock purchases by the defendants Barness, Candiotty, Siegel and Beck. On June 29, 1973, the Daylin board resolved to amend the Plan as follows:

(1) to reduce the term of notes issued for Daylin stock from ten years to seven years;

(2) to increase the minimum interest payable on the notes from 4% to 6½%;

(3) to adjust the purchase price of the stock downward to $6.50 per share (the closing stock price on the New York Stock Exchange on July 2, 1973).

On October 15, 1973, the Handy Dan board resolved to make corresponding changes with respect to the November 1972 stock purchases. These reduced the effective purchase price of the Handy Dan stock from $16.50 per share to $9.50 per share.[2]

---

2. Daylin's attorney asserts in his brief (p. 4) that

"the modifications were never actually implemented and, on July 8, 1974, Handy Dan's Board of Directors revoked its authorization of the modifications and reinstated the original purchase terms."

The practical effect of these resolu-tions was as indicated below:

### Daylin Stock

|  | Original Obligation | Reduced Obligation | Reduction |
|---|---|---|---|
| Barness | $1,250,000 | $ 487,500 | $ 762,500 |
| Candiotty | 1,250,000 | 487,500 | 762,500 |
| Siegel | 162,500 | 65,000 | 97,500 |
| Totals: | $2,662,500 | $1,040,000 | $1,622,500 |

### Handy Dan Stock

|  | Original Obligation | Reduced Obligation | Reduction |
|---|---|---|---|
| Barness | $34,650 | $19,950 | $14,700 |
| Candiotty | 26,400 | 15,200 | 11,200 |
| Beck | 4,950 | 2,850 | 2,100 |
| Totals: | $66,000 | $38,000 | $28,000 |

It is plaintiff's claim that the proxy material sent to stockholders for the January 1974 annual meeting falsely presented the increase in interest rate and decrease in term of the notes as burdens imposed on the defendant purchasers in order to obtain their "consent" to such changes in the Plan, when in fact they obtained substantial reductions in the principal amount of their indebtedness and Daylin will, in fact, receive substantially less interest despite the increased rate. In sum, says plaintiff, not only did the defendants violate the securities laws and proxy rules but they also diverted and wasted corporate assets solely to the benefit and advantage of the defendants Barness, Candiotty, Siegel and Beck in violation of their fiduciary duties and to the detriment of Daylin and its stockholders.

*The Proposed Settlement Terms*

Plaintiff's attorneys, unquestionably able and experienced in this field of liti-gation, state they have completed discovery including lengthy depositions of defendants and massive document production in California, and are substantially ready for trial. Defendants have since made an offer of settlement, however, which plaintiff's attorneys estimate as having a value of in excess of $1,300,000, "nearly 80% of the amount requested in the complaint." This settlement, they recommend, as "prima facie fair, reasonable and adequate, taking into account the hazard and uncertainties of all litigation."

The proposed stipulation of settlement provides in substance as follows:

(1) Daylin's Key Executive Compensation Trust ("Trust") will be canceled and its assets (estimated to be worth in excess of $1,300,000)[3] will be returned to Daylin.

(2) The reduced indebtedness to Daylin of defendants Barness, Can-

3. Mr. Rabin estimates the value of the Trust at $1,367,000 as of August 31, 1974 and $1,392,000 as of October 11, 1974. Affidavit of I. Stephen Rabin (Rabin Affidavit) at 4. Mr. Pomerantz, however, claims that it is really worth $1,575,000.

Exhibit C to the Rabin Affidavit indicates that the Trust assets consist of $529,614 in common stock, $334,000 in corporate bonds, $3,196.89 in savings and time accounts and $500,000 in real estate ventures.

diotty and Siegel, now totaling $780,332 (by reason of their installment payments on the prior promissory notes), arising out of their stock purchases under the Plan, will be canceled.

(3) The installment payments made by Messrs. Barness, Candiotty and Siegel totaling approximately $342,000 will not be returned to them in cash but they will receive instead common stock of Daylin at the current market price (now $2.00 per share or less).[4]

(4) Defendants Barness and Candiotty will each surrender and return to Daylin 50,000 qualified stock options to purchase Daylin common stock (at $6.50 per share).

In addition, there are the usual provisions for payment of plaintiff's attorneys fees and expenses and other costs and expenses in connection with the settlement.

## Analysis of the Proposed Settlement

In recommending the proposed settlement, plaintiff's attorneys lay great stress on the termination of the Trust, which they contend will result in transferring some $1,300,000 of frozen assets to Daylin. The court finds those statements somewhat disingenuous. To understand the reason, it is necessary to explain what the Trust is. Essentially, it is another form of key executive incentive program adopted by Daylin's board of directors on November 20, 1972 and ratified by the stockholders on January 16, 1973. The basic idea was to provide "a funded investment vehicle" in which key executives could acquire a proprietary interest in a substantial investment fund, awarded and measured by improved earnings of Daylin, thereby stimulating such executives to bring about improved earnings.

The "vehicle" for this incentive program was the Trust created and funded by Daylin with $1,650,000. That fund, held by a bank as trustee, was to be invested and reinvested in securities and improved and unimproved real property for purposes of current investment yield or appreciation or both. For its investment, Daylin received from the Trust 1,500 subordinated participation units (common shares) and 1,500 senior participation units (preferred shares). Of the initial trust capital of $1,650,000, the common shares represented equity of $150,000 ($100 per share), and the preferred shares represented $1,500,000 ($1,000 per share). The preferred shares carry a cumulative dividend,[5] have a priority claim on liquidation of the Trust to the first $1,500,000 plus

4. During the continuation of the hearing on November 6, 1974, counsel for the defendants indicated they might agree to have the conversion price pegged at $2.00 per share. Tr. 57.

5. Section 3.2 of the Declaration of Trust implements the dividend provision called for in the program and provides:
"3.2 DISTRIBUTION OF INCOME. The holders of Shares of Senior Participation shall be entitled to receive an annual Distribution Preference, as and when declared by the Trustees, at a rate per Share of $45, plus a sum not to exceed $25, equal to the amount, if any, by which Trust Net Income for each Trust fiscal year, divided by the number of outstanding Shares of Senior Participation, exceeds $45. Such Distribution Preference, when declared by the Trustees, shall be payable annually at one time or more frequently on or before the first day of the third month of the next succeeding fiscal year of the Trust. Any unpaid Distribution Preferences shall be cumulative and shall be paid before any distributions shall be declared or paid upon or set apart for the holders of Shares of Subordinated Participation.
"Whenever full cumulative Distribution Preferences for the then current year and all previous years shall have been declared and paid upon or set apart for the holders of Shares of Senior Participation, the Trustees may declare and pay to the holders of Shares of Subordinated Participation any excess Trust Net Income accumulated to the date of distribution."
The effect of this provision is a dividend yield of between 4½% and 7% on the par value of the preferred shares.

dividend arrearages and have no voting rights. The common shares have voting rights but dividend and liquidation rights subordinate to the preferred shares.

Under the incentive program, the 1,500 subordinated common shares were distributed in varying proportions among a group of Daylin's key executives.[6] Defendants Barness and Candiotty received 465 and 345 shares, respectively, and defendant Beck 120 shares, for a total of 930 shares out of the 1,500. These were purchased by the respective defendants at par value by paying at least $1.00 per share with the balance payable not more than 10 years later. The ownership of these common shares made these executives eligible to receive without payment in future years allotments of the preferred shares at the rate of not more than 10 preferred shares for each 1¢ per share increase in annual consolidated earnings of Daylin over the $1.42 per share base in 1972.

General economic conditions since 1972 have virtually frustrated the incentive purpose and have also caused a decline in the value of the Trust assets. Daylin's earnings for fiscal 1973 were $1.13 a share and for fiscal 1974 it has reported a huge loss. The present value of Trust assets has been variously estimated at approximately $1,400,000.[7] These events apparently helped to generate the proposal that the early dissolution of the Trust be made a "vehicle" for the settlement of this suit.

When plaintiff's attorneys say that the proposed settlement will return to Daylin cash or its equivalent approximating 80% of the $1,650,500 plaintiff demands as damages, they mean the proceeds of the Trust. In this connection, it should be noted that Daylin is still the owner of the 1,500 preferred shares which represent the senior equitable ownership of all the Trust assets. The program creating the Trust expressly provides that commencing January 1, 1978 Daylin may, at its option, redeem the preferred shares it then holds at a redemption price per share equal to $1,000 plus cumulative dividend arrearage, if any.[8] It also provides, moreover, that "[n]otwithstanding anything to the contrary herein, the Board of Directors of the corporation may *at any time* withdraw from the Program any or all preferred shares then held . . . by the corporation, in which event such withdrawn preferred shares shall be freely transferable to any person unencumbered by and without regard to the provisions of this Program . . . ." (Emphasis added.)

The virtue of this proposed settlement is really extolled on a very narrow ground—that Daylin is in critical need of the $1,000,000 plus in cash which early liquidation of the Trust assets would produce. This cannot be accomplished, it is asserted, without the consent of the owners of all the subordinated common shares in the Trust. These include, of

| 6. | Barnes | 465 |
| | Candiotty | 345 |
| | Finkle | 165 |
| | Alpert | 120 |
| | Beck | 120 |
| | Levin | 105 |
| | Mallory | 105 |
| | Kritzer | 75 |
| | Total: | 1,500 |

All but the last three are defendants in this suit.

7. See footnote 3, *supra*.

8. The Declaration of Trust provides:

"3.3. REDEMPTION. The Trustees, in their sole discretion, at any one time or from time to time, or upon the direction of the Company (but only with respect to Shares then held by the Company), at any time commencing on or after January 1, 1978, may redeem the whole or any part of the Shares of Senior Participation for an amount (payable in cash or in property or both, as the Trustees may determine) equal to $1,000 per Share, plus, in each case, an amount equal to the sum, if any, of all unpaid Distribution Preferences thereon to the date of such redemption."

course, the defendants Barness, Candiotty and Beck.[9]

It is true that the Declaration of Trust makes provision for termination of the Trust "at any time" prior to January 1, 1994 only if Daylin is the holder of all the outstanding subordinated common shares, which it presently is not. Otherwise, the Trust may only be terminated "at any time *after* January 1, 1978 by written notice to the Trustees consented to by the holders of a majority in interest of all of the outstanding shares of Subordinated Participation [*i. e.,* the voting common shares]" (Art. II, § 2.1). The only apparent advantage to be gained by Daylin from the proposed settlement would be the acceleration of the return of its own property instead of waiting out the time periods specified in the Declaration of Trust.

*The Proponents' Position*

In urging approval of the proposed settlement, the proponents adopt a practical rather than a legal approach. Plaintiff's counsel, while confident of the merits of his case, acknowledges that the relief plaintiff is really seeking is reinstatement of the original obligations of Messrs. Barness, Candiotty and Siegel to pay $2,662,500 for the Daylin stock they purchased in 1972. Such a victory, however, may prove to be Pyrrhic. Barness and Candiotty have filed affidavits setting forth cost and forced liquidation values for their total assets as against liabilities which reflect that they are presently insolvent. The proponents argue that those defendants are thus in no position to pay the more than $2,000,000 that would be owing to Daylin after deducting payments already made on their notes. Their logical reasoning is that cancellation of the $780,332 still owed on the remaining $1,040,000 in promissory notes, as pro-

vided in the proposed settlement, would therefore cause no real detriment to Daylin because they are uncollectible in any event.

As already indicated, it is essentially the proponents' position that since Daylin is in urgent need of liquid assets, its best hope of salvaging something out of this suit is to regain immediate control of the assets frozen in the Trust. They point out that Daylin cannot liquidate the Trust unless the defendants transfer to Daylin all of the Trust common shares they now hold. The proposed settlement provides for such a transfer and thus, the proponents argue, it accomplishes an immediate benefit to Daylin to the extent of approximately $1,400,000.[10]

Furthermore, they point out, the present value of the original indebtedness is considerably less than $2,662,500, since a large discount factor must be applied to at least approximately 65% of the principal amount which is not due until 1980–82. A Daylin accountant has calculated the present value of the unpaid balance on the original promissory notes to be $1,431,606, of which $411,450 is presently overdue. Thus, according to the proponents, the maximum amount Daylin is giving up if the settlement is approved, in terms of present value, is $1,431,606. That amount, they argue, is almost completely offset by the $1,400,-000 Daylin will receive as a result of the termination of the Trust, and which it would not receive but for this settlement.

*The Objectants' Position*

The objecting stockholders view the proposed settlement differently, characterizing it as but another attempt to benefit the defendants Barness, Candiotty and Siegel at the expense of the corporation. Responding to the proponents'

9. Although three of the holders of Trust common shares are not defendants here, they have consented to rescind their purchases of these shares if the settlement is approved.

10. See footnote 3, *supra.*

practical argument, the objectants point out that Barness and Candiotty each own in excess of 220,000 Daylin shares, which, although now selling at less than $2.00 per share, were $17.00 per share only two years ago. They maintain that if these defendants are insolvent, it is only the technical result of the vagaries of the stock market. They add that (1) both men presently earn substantial incomes and will probably continue to do so; and (2) the bulk of the principal payments on the promissory notes do not become due until 1980–82, at which time the defendants may well be able to pay them.

The objectants particularly criticize that term of the proposed settlement under which Barness and Candiotty will surrender 160,000 shares of Daylin stock, purchased at an average price of $16.00 per share under the 1972 agreement, but will receive back more than 170,000 shares, at the current market price of less than $2.00 per share, in return for permitting Daylin to retain the $342,000 which they already paid on their notes.

The objectants also take sharp issue with the proponents' contention that Daylin is presently effectively precluded from utilizing the Trust assets. They concede that without the common shares Daylin cannot itself liquidate the Trust. They point out, however, that Daylin, which continues to hold all the preferred shares, can withdraw them from the Trust program at any time and either sell or hypothecate those preferred shares and thus receive substantially the present value of the Trust assets.

### The Question of Fairness

■ That only five out of 4,300 stockholders voiced objection to the proposed settlement is not a controlling factor in determining its fairness to the corporation in whom all stockholders have an interest. The First Circuit in

Greenspun v. Bogan, 492 F.2d 375, 378 (1 Cir. 1974), recently reaffirmed some familiar general principles applicable to this type of proceeding:

"It is well established that a court should not merely rubber stamp whatever settlement is proposed by the parties to a shareholder derivative action. A court must, instead, exercise judgment sufficiently independent and objective to safeguard the interests of *shareholders not directly involved in the action* [citations omitted] . . . . At the very least, the district court must possess sufficient evidentiary facts to show the fairness of the proposed settlement; the burden is placed squarely on the proponents of the settlement to show that it is in the best interests of all those who will be affected by it." (Emphasis added.)

■ The question of the fairness of a proposed settlement of a stockholder's suit is generally resolved by weighing " 'the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement.' " City of Detroit v. Grinnell Corporation, 495 F.2d 448, 455 (2 Cir. 1974), quoting from West Virginia v. Chas. Pfizer & Co., 440 F.2d 1079, 1085 (2 Cir. 1971). But this is not the ordinary case; indeed, it strikes the court as most extraordinary. Here, there is no "amount offered in settlement"—only the "consent" of interested defendant directors and officers to free for corporate use in time of need assets which the corporation already equitably owns.

■■ In the court's judgment, the proponents have wholly failed to demonstrate that the proposed settlement is in the best interests of the corporation and its stockholders. On the facts made available, it would appear that Daylin is being asked to relinquish meritorious causes of action for waste and breach of

fiduciary duty,[11] at least as against those defendant directors and officers who directly benefited from the reduction of their debts, without visible consideration passing to the corporation. Under the terms of the proposed settlement, Daylin is now being asked to relinquish even its reduced claims on the promissory notes given by those directors and officers, while permitting them to receive an even greater number of shares of Daylin stock than for which those notes were originally given.

The consideration for this latest bargain seems even more evanescent. The court agrees with the objectants that as a practical matter Daylin's ownership of all the preferred shares of the Trust gives it the right *now* to withdraw those shares from the program which the Trust was established to carry out.[12] Even if those preferred shares cannot be "redeemed" directly out of Trust assets until after January 1, 1978, if withdrawn, they are "freely transferable to any person unencumbered by and without regard to the provisions of this Program . . . ."[13] Thus, they could be sold or pledged as security for loans, if Daylin is indeed in need of liquid capital now. The "consent" of the defendants is unnecessary to accomplish what Daylin can effectively do now.

Moreover, if Daylin is, in fact, in urgent need of cash now, a serious question would arise were these defendants —who are fiduciaries—to withhold their consent because of personal conflicting interests.

Finally, the conclusory affidavits purporting to show the insolvency of Messrs. Barness and Candiotty fail to satisfy the court that men of their position in Daylin and presumed financial standing are incapable of satisfying a judgment to any extent, if one should be rendered against them. The question is not whether they are or will be financially responsible in that event but whether any real consideration is passing to Daylin in exchange for the dismissal with prejudice of this suit. In the court's view the consideration is all going the other way and the settlement

---

11. While the cause of action under section 14(a), even if successful, may not result in a monetary recovery, see Hoover v. Allen, 241 F.Supp. 213 (S.D.N.Y.1965), the claims of waste and breach of fiduciary duty appear to have merit notwithstanding the defendants' assertion that the reductions in the notes were effected by the votes of disinterested directors. See Gottlieb v. Heyden Chemical Corporation, 33 Del.Ch. 82, 90 A.2d 660, 663–664 (1952). Transactions between directors and their corporation are usually judged against a standard of fairness to the corporation. Pepper v. Litton, 308 U.S. 295, 306–307, 60 S.Ct. 238, 84 L.Ed. 281 (1939); Gottlieb v. McKee, 34 Del.Ch. 537, 107 A.2d 240, 243 (Ct. of Chancery 1954); Stanton v. Occidental Life Insurance Co., 81 Mont. 44, 261 P. 620, 627 (1927). If this standard is applied here, the defendants will have a difficult burden of establishing the fairness to Daylin of the *quid pro quo*. Defendants' attempt to view the reductions in the notes as inducing Barness, Candiotty and Siegel to remain in Daylin's employ is questionable consideration at best. See Kerbs v. California

Eastern Airways, Inc., 33 Del.Ch. 69, 90 A.2d 652, 656 (1952); Holthusen v. Edward G. Budd Mfg. Co., 52 F.Supp. 125 (E.D.Pa. 1943).

12. The program establishing the Trust provides in part under Roman numeral IV, entitled "Amount of Shares Subject to the Program":

"Except to the extent otherwise required under this Program or by law, shares shall be freely transferable by the holder. Notwithstanding anything to the contrary herein, the Board of Directors of the corporation may at any time withdraw from the Program any or all preferred shares then held or thereafter reacquired by the corporation, in which event such withdrawn preferred shares shall be freely transferable to any person unencumbered by and without regard to the provisions of this Program, provided, however, that the corporation shall not transfer withdrawn preferred shares to any employee of the corporation or of a subsidiary corporation."

13. *Id.*

in its present form is not in the best interest of Daylin or its stockholders.

Approval of the proposed settlement is therefore denied.   Settle order on notice.

So ordered.