Saul GOLDSHOLL, Plaintiff,

v.

James J. SHAPIRO et al., Defendants.

No. 75 Civ. 3361(MP).

United States District Court,
S. D. New York.

Aug. 2, 1976.

**1292**

Garwin & Bronzaft, New York City, by Sidney Garwin, and Bertram Bronzaft, New York City, for plaintiff.

Paskus, Gordon & Hyman, New York City, by Robert R. Slaughter, New York City, for defendant (Simplicity Pattern Co., Inc.).

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, by Jay Topkis, and Max Gitter, New York City, for defendants (James J. Shapiro, Affinito, Cooper, Hess, Kenzer, Lund, Macbain, Pilson, Schwartz, and Robert M. Shapiro).

## OPINION

POLLACK, District Judge.

The parties to this stockholder's derivative action against certain officers and directors of Simplicity Pattern Co., Inc. (hereafter "Simplicity") have submitted a proposed settlement to the Court for approval pursuant to Rule 23.1, Fed.R.Civ.P.

Hearings on the settlement, at which only its proponents were represented in person, were held on April 28, 1976, July 1, 1976, and July 23, 1976. A long time stockholder with substantial holdings of Simplicity stock submitted a written objection.

Upon careful examination of the four corners of the proposed settlement and the proponents' written and oral support for it, the Court has concluded that the proponents have failed to carry their burden of showing that the settlement in its present form is fair, reasonable and adequate under all the circumstances complained of in the Complaint and revealed upon the proceedings herein and that it must be disaffirmed in its present (amended) form.

### I. The Parties and Pleadings

The Complaint in this derivative stockholder's action, filed July 9, 1975, asserts that violations of Sections 10 and 14 of the Securities Exchange Act of 1934, the Rules and Regulations promulgated pursuant to those sections, and the common law occurred in connection with various forms of compensation awarded to certain Simplicity directors in the last few months of 1974.

Plaintiff, a resident of Arizona, contends that the Court has federal question, diversity and pendent jurisdiction over the claims asserted in the Complaint.

The individual defendants are, or were before their retirement, the directors and senior officers of Simplicity. Defendants Robert Shapiro and Alfred Pilson retired, respectively, in 1974 and 1975. Defendant James Shapiro has already announced his forthcoming retirement this year and defendant Myron Kenzer is also scheduled to retire at the end of this year. The Answer of the defendants denies the principal allegations of the Complaint and asserts affirmative defenses going to the jurisdiction of the Court and the sufficiency of the claims.

### II. The Corporate Transactions at Issue[1]

The Complaint charges that James J. Shapiro has dominated Simplicity's Board and serves as Simplicity's chief executive officer, and that Shapiro and six other directors entered into a plan to enrich themselves unfairly at the expense of the corporation. They allegedly implemented this plan by causing the corporation (1) to enter into employment and post-retirement consulting contracts with them bearing excessive compensation, (2) to amend the Retirement Plan to permit the payment to themselves of lump-sum retirement benefits in advance of actual retirement, and (3) to improperly amend a Stock Option Plan without stockholder approval and procure unwarranted benefits thereby.

---

1. The descriptions of the relevant transactions provided herein are based in large measure on defendants' written and oral accounts.

The proposed settlement (described *infra*) purports to remedy only the third of these alleged abuses of fiduciary duty.

The various transactions questioned herein occurred as follows:

At a meeting held November 25, 1974, the Simplicity Board voted to increase the annual remuneration to James Shapiro, the chief executive, under an existing employment contract from $156,000. to $200,000. and increased the annual post-retirement payments to him under an existing consultant's contract from $100,000. to $120,000. guaranteed to him or to his widow or estate for 10 years. The payments so provided would also become due to Shapiro's widow or estate should he not survive to his actual retirement date.

Post-retirement consultant contracts were also voted to Robert Shapiro[2] and Alfred Pilson;[3] employment contracts were voted for Messrs. Lund,[4] Cooper[5] and Affinito;[6] and a combination employment and consultant contract was voted for Myron Kenzer.[7]

Each of the above-mentioned contracts was passed by a round robin unanimous vote of all directors at the same meeting omitting the director who was the subject of the contract in each case.

2. Robert Shapiro received a consultant contract of 10 years at $75,000. a year to commence January 1, 1975.

3. Alfred Pilson received a consultant contract at a rate of $30,000. per annum for two years starting May 1, 1975 and at $25,000. per annum for three years thereafter.

4. George Lund, an executive vice president, received a salary of $84,000. a year through January 31, 1980 for serving as an executive vice president.

5. Harold Cooper, then an executive vice president and now president, received a $72,000. salary through January 31, 1980.

6. Lilyan Affinito, then a vice president and now treasurer, received the same terms as Cooper.

7. Myron Kenzer, a vice president, received a salary of $65,000. through December 31, 1975 and a consultant's fee of $25,000. a year for five years thereafter.

To fulfill the requirements of 17 C.F.R. § 240.14a–101 (which requires that management salaries be disclosed in a proxy statement), the employment and consultant contracts and their amounts were reported to the stockholders under date of May 1, 1975 but no mention was made in the proxy statement that the amounts represented recent increases and compensation benefits voted by the directors to each other seriatim as indicated. A preliminary copy of the statement was submitted to and received no comments from the Securities and Exchange Commission; it gave notice of a June 1, 1975 stockholders' meeting at which directors would be elected.

Also passed at the November 25, 1974 Board meeting was an amendment to the salaried employees' portion of the corporation's retirement plan. That amendment made it possible for the first time for a salaried employee to receive retirement benefits in advance of actually retiring from service.[8] Since the Plan already had provided the corporation's Retirement Committee with authority to pay out retirement benefits in a single lump-sum,[9] this amendment meant that the corporation was permitting such single lump-sum payments during actual employment.

Accordingly, on March 11, 1975, James Shapiro, who was then and is currently finishing his service as Simplicity's chief executive officer,[10] received a single lump.

8. The new amendment, labeled "Section VII—Continued Employment After Normal Retirement Date," provided that

> The retirement benefit payable at Normal Retirement Date [age 65] to the Employee shall commence on the Normal Retirement Date of such Employee notwithstanding that such Employee shall after said date remain in the active service of the Company.

9. Section XXV of the Plan provided then and provides now that

> . . . the Retirement Committee may, within its sole discretion, direct the payment of any retirement benefits to any Employee in any form which is the actuarial equivalent of the monthly life annuity otherwise then payable to him under the Plan, provided that such form of payment shall not adversely affect the soundness of the Plan . . .

10. On June 4, 1976 James Shapiro announced his retirement effective at the end of this year.

sum payment of his full retirement pension benefits in the amount of $598,109.98.[11] Similarly, Myron Kenzer, who is also still serving as a Simplicity executive, received a lump sum payment of $127,004.72 on September 11, 1975. Also as a result of the new amendment, Alfred Pilson received his first annual installment of pension benefits of $11,005. on May 1, 1974, a year in advance of his actual retirement.

By their amendment to the pension payment system, the Directors were altering a plan which had been created by vote of the stockholders in 1945,[12] but which gave the Board power to amend in certain respects.[13] No notice of the 1974 amendment was given to the stockholders, nor was their consent obtained to the new concept. Nor were stockholders and investors told that nearly six hundred thousand dollars had been paid out to the chief executive under the change effected by the directors. General notice that payments of retirement compensation had been made to Shapiro and Pilson was included in footnotes to the May 1, 1975 proxy. However, the footnote concerning the payment to Shapiro merely stated that he had received an unspecified amount of payment "which represented the actuarially computed present value of his annual benefit of $57,098."

Ten days after the meeting at which the contract and the retirement pension plan measures were adopted the Board of Directors (with the consent of the optionees) cancelled stock options held by James J. Shapiro to purchase 150,000 shares of Simplicity stock at $29.4583 a share and stock options held by Robert Shapiro to purchase 75,000 shares at the same price.[14] These options had been granted to the Shapiro brothers on November 24, 1970 pursuant to an Option Plan adopted by the Board and the stockholders in 1966. That plan was, by its own terms, intended to provide "an *incentive* to key employees and to offer an additional *inducement* in obtaining the services of key personnel." [Emphasis added] It provided that options on 153,829 shares could be granted to key personnel under the age of 65; that the option price could be no less than the full market value of the stock at the time of the grant; that options lapsed five years after the date of grant; and that no amendment to the maximum number of shares available for the Plan or the eligibility of potential optionees was possible without the vote of the majority of outstanding shares.

Immediately before this cancellation of the options exercisable at $29.4583 per share there were available for issuance under the Option Plan only 70,133 shares of stock.

Then, seven or eight days later, on December 13, 1974, the Stock Option Committee of the Board of Directors (at the instance of the Board, according to the Complaint) awarded options on 222,500 shares of stock at the then current market price of $7.75 to James J. Shapiro and four other Simplicity directors. The options so distributed were on 150,000 shares to James Shapiro; 22,500 to George Lund; 10,000 to Kenzer; 20,000 to Cooper and 20,000 to Affinito.[15]

---

**11.** This figure was arrived at by an independent actuary using an interest assumption of 4.5%, the same assumption used to fund the pension fund.

**12.** The fact that the shareholders had approved the retirement plan had apparently been inadvertently overlooked by the plaintiff's and defendants' attorneys and the settlement as originally outlined erroneously referred to the Plan as a directors', not a stockholders', plan which did not require approval of stockholders to amendments. Following the first hearing herein, an attorney for the defendants, responding to an inquiry by the Court on this subject, discovered in the corporate minute book that a shareholders' vote initiated the Plan, not a vote by the Board of Directors.

**13.** Section XIX grants the Board this power.

**14.** Robert Shapiro retired on December 31, 1974.

**15.** Since the granting of these options the number of options held by each of the five directors and officers has gone up and their exercise price has gone down as a result of a stock dividend announced by Simplicity. The present exercise price is $7.561 and the outstanding options are distributed as follows: Shapiro (153,750); Cooper (20,500); Affinito (20,500); Lund (23,062); and Kenzer (10,250).

As with the other compensation benefits mentioned above, the stockholders were *not* notified of these stock option transactions to the key executives either before or on their effective dates. The proxy statement of May 1, 1975 listed the then-current option holdings of the various directors and their exercise price, and, in a brief concluding paragraph, it noted that the Shapiro brothers' previous options on stock had been surrendered. Nowhere in the proxy statement is there any suggestion that there was a markdown of the exercise price from $29.46 to $7.75 per share by means of the surrender of old options and the award of a like number of reduced price options.

Not too long after the award of options exercisable at $7.75, the market price of Simplicity stock rose to, and has since fluctuated around, $15.. a share.

At the time all the above-described increases in executive remuneration were approved (namely, late 1974) James Shapiro was about to become 65, Pilson was already 65 and Kenzer was 64. Robert Shapiro had already elected early retirement. The other three "inside" directors, Cooper, Lund and Affinito, were 51, 45 and 43 respectively; and the remaining four directors were all "outsiders." It has been disclosed in the papers that there is a company policy calling for retirement of executives at age 67.

### III. The Proposed Settlement and One Stockholder's Objections To It

In proffered full settlement of all the claims contained in the Complaint, the parties initially proposed that the exercise price for all the options awarded in December of 1974 be increased from $7.561 to $9.355 a share on the options to James Shapiro and from $7.561 to $8.560 a share on the options to the four other officers. If all the options were eventually exercised, this proposal would mean that the corporation would realize an additional $350,064.69 over the exercise price it would have received under the December 1974 grant.

Within a few weeks of the mailing of the settlement hearing notice, the Court received a letter of objection from one John Bruce Cox, who asserts that along with his wife he owns 21,655 shares of Simplicity and has owned stock in the company for over 22 years. This letter contains a number of objections to Simplicity's corporate practice in general (e. g., claims that a stockholder can never determine from one year's proxy statement the increase in officers' salaries without a proxy statement from the previous year, and claims that the corporation is over-capitalized) and to the transactions at issue. Contending that the notice of settlement is typical of Simplicity's communications to stockholders, Cox complains particularly of the failure of the notice to set out the gross amount of the lump-sum payment to Shapiro, the interest rate assumption used to calculate the amount of that payment, and the size the payment would have been if it had been based on "current interest rates." He also complains of two previous stock option transactions.

After questioning from the Court on the proposed stock option plan adjustment at the first and second hearings on the settlement proposal, the parties voluntarily amended the proposal. In addition to agreeing to the above-described step-up in exercise prices for James Shapiro and the others, defendants offered to agree to surrender 82,000 of the options granted in December of 1974, i. e., the number of stock options awarded in that period which plaintiff asserts were over and above the number of options provided for in the 1966 Stock Option Plan. Under the revised proposal, James Shapiro was to surrender 77,000 of the options he obtained, leaving him with 76,750 options at an exercise price of $9.355 a share. The remaining 5,000 options to be surrendered were to come from Kenzer, leaving him with 5,250 options at an exercise price of $8.560 a share.

### IV. The Applicable Standards of Law

■ In considering an application for approval of a settlement pursuant to Rule 23.1, which will bind absent and non-assenting stockholders, the Court must determine if the proposal is "fair, reasonable and adequate." *Levin v. Mississippi*, 59 F.R.D. 353,

361 (S.D.N.Y.), aff'd 486 F.2d 1398 (2d Cir.), cert. denied, 414 U.S. 1112, 94 S.Ct. 843, 38 L.Ed.2d 739 (1973); *Milstein v. Werner*, 57 F.R.D. 515 (S.D.N.Y.1972).

 While the extent to which a Court may interpose its own independent business judgment for that of the corporate directors is a subject of no little controversy, compare *Schleiff v. Chesapeake & O. Ry.*, 43 F.R.D. 175, 178 (S.D.N.Y.1967), with *Wolf v. Nazareth Enterprises, Inc.*, 303 F.2d 152, 154 (2d Cir. 1962), and *Neuwirth v. Allen*, 1961–64 CCH Fed.Sec.L.Rep. ¶ 91,324 (S.D.N.Y.), aff'd 338 F.2d 2 (2d Cir. 1964); cf. Haudek, *The Settlement and Dismissal of Stockholders' Actions*, 22 S.W.L.J. 792–3 (1968), it is clear that the application of that judgment is unavoidable where, as here, the proposed settlement falls within a "penembra between fairness and unfairness." *Haudek, supra*, at 797. In all cases of settlement approval, the Court is called upon to balance the likelihood of recovery in the action against the benefits of the compromise, *Fricke v. Daylin, Inc.*, 66 F.R.D. 90, 97 (E.D.N.Y.1975); *Cannon v. Texas Gulf Sulphur*, 55 F.R.D. 308 (S.D.N.Y.1972); *Winkelman v. General Motors Corp.*, 48 F.Supp. 490 (S.D.N.Y.1942); *Haudek, supra*, at 793, but it is not for the Court to make a final decision on the merits. In this and all other respects the burden of proof is squarely on the proponents of the proposal. *Fricke, supra.*

 The Court is, in a sense, a third party to the settlement negotiations; a participant whose task it is to insure the protection of all stockholders of the corporation. Accordingly, the duty of the Court to exercise independent judgment in a case such as this is not lessened by the absence of a great number of objections from shareholders, and absence of objectors may not be taken as a factor either in favor of or against the proposal. *Greenspun v. Bogan*, 492 F.2d 375, 378 (1st Cir. 1974); *Fricke, supra* at 97; *Norman v. McKee*, 290 F.Supp. 29 (N.D.Cal.1968), aff'd 431 F.2d 769 (9th Cir.), cert. denied, 401 U.S. 912, 91 S.Ct. 879, 27 L.Ed.2d 811 (1970); *Silverstein v. Clarkson*, 194 Misc. 1046, 88 N.Y.S.2d 67, 71 (Sup.

Ct.1945). If anything, the Court is required to be more vigilant where shareholders, for whatever reason, remain silent.

In fulfillment of this function, the Court is principally called upon to determine whether the various forms of executive remuneration before it, taken together or separately, seem to amount to such excessive compensation, waste and/or spoliation as to require greater redress than is offered in the proposal *sub judice*. The classic test for such questions of waste is set out in *Rogers v. Hill*, 289 U.S. 582, 591–2, 53 S.Ct. 731, 735, 77 L.Ed. 1385 (1933):

> If a bonus payment [or any other form of executive remuneration] has no relation to the value of the services for which it is given, it is in reality a gift in part and the majority stockholders [or the directors acting by themselves] have no power to give away corporate property against the protest of the minority.

The question here is whether the benefits to Simplicity executives bore any reasonable relation to the extent of the services contemplated therefor or the purposes to be served by granting the directors the power to award such benefits.

 In justifying the increase in James Shapiro's salary to $200,000., a year or two prior to his mandatory retirement, defendants argue not only that such a figure was commensurate with the salaries of other executives in major American corporations but also that it was proper in light of the added burdens placed on Shapiro by the departure of one of the company's top executives and in light of Shapiro's contribution to the industry of home sewing. Presumably, some of the same facts are meant to justify the contemporaneous $20,000. annual increase in Shapiro's ten-year post-retirement consultant's fee.

There are four major areas of concern addressed by the defendants in their efforts to support the alteration of the stockholder-approved retirement plan: (1) the general propriety of lump-sum payments in advance of actual retirement; (2) the propriety of the 4.5% interest rate assumption; (3) the propriety of the director's exercise of the

power to alter the stockholders' plan; and (4) the degree to which the fact of and results of the alteration should have been and were disclosed to stockholders.

In support of the concept of pre-retirement lump-sum payments, defendants cite a recent amendment to the federal tax laws which affords favorable tax treatment to such payments and which, defendants argue, therefore manifests a congressional intent to encourage such payments. 26 U.S.C. § 402 (1976 Pocket Part), amending, 26 U.S.C. § 402.

While it is true that a portion of pre-retirement lump-sum payments is given capital gains treatment, an examination of the legislative history behind this amendment indicates that in granting this treatment to corporate employee's pension payments Congress was focusing on an existing inequitable distinction between such employees and the self-employed, and not deciding issues going to state law on corporate waste. Congress had, in the Tax Reform Act of 1969, granted partial capital gains treatment to pre-retirement lump-sum payments taken by the self-employed because the governing principle of separation from service had no rational applicability to the self-employed. In 1974, the statute was amended to drop that principle from the section covering corporate employees as well in order to eliminate a perceived inequity, not to provide an inducement for such payments. See H.R.Conf.Rep. No. 93–1280, 93rd Cong., 2nd Sess. (August 12, 1974), 74 *U.S.Code Cong'l & Admin.News* p. 5127 *et seq.*; H.R.Rep. No. 93–807, 93rd Cong., 2nd Sess. (February 21, 1974), *id.* at p. 4811 *et seq.* Therefore, by its amendment to this section of the Tax Code Congress intended neither to encourage nor discourage payments such as the one received by James Shapiro. Additionally, even if the legislative history bore out the defendant's argument, any indication that Congress intended to encourage these payments could not possibly immunize all such payments from a claim under the state laws of corporate waste.

As to the propriety of the 4.5% interest rate assumption, defendants argue that the fact that that figure was supplied by an independent actuary and was used to fund the pension fund as well as to compute lump-sum payments from that fund indicates the reasonableness of that pay-out interest rate. They submit actuaries' affidavits indicating that it is the "universal practice" to use the same interest rate for pay-outs as for pay-ins and they cite legislative history from the Pension Reform Act of 1974 (the same act that contained the above-discussed Tax Code amendment) indicating that "a single set of actuarial assumptions will be required for all purposes . . . ." H.R.Conf.Rep. No. 93–1280, 93rd Cong., 2nd Sess. (August 12, 1974), 1974 *U.S.Code Cong. & Admin.News* pp. 5065–5066. They argue that if a higher interest rate assumption were used for pay-outs (thereby lowering the amount of lump-sum payments) the fund would be "unjustly enriched." Finally, defendants submit material suggesting that the performance of this fund, pension funds in general, and the market in general has been below the 4.5% rate.

While many of defendants' arguments are facially persuasive and may in sum refute any claim of excessive compensation based on the actuarial interest rate assumption by itself, it is worth noting that a corporation has reasons for using a low rate that are entirely independent of the application of such a rate to the computation of pay-outs. A conservative figure is appropriate in order to absolutely ensure that the fund will not be overly-depleted. Although it ought to be fair in computing lump-sum pay-outs, the corporation does not have quite the same justification for using a low figure with respect to those pay-outs. Therefore, the use of the 4.5% figure in computing pay-outs, especially when taken with the other circumstances of this case, may well bear closer inspection.

The amendment of the Retirement Plan itself was entirely proper, according to defendants. They note that section XIX of

the retirement plan provides the Board with full power to "modify or amend or terminate the Plan in whole or in part," and they argue that, since the vote of the directors met the standards set out in N.Y. Business Corporation Law § 713 for the approval of transactions between a corporation and its directors,[16] the amendment was wholly reasonable.

The principles set out in *Winkelman v. General Motors Corp.*, 44 F.Supp. 960, 1003 *et seq.* (S.D.N.Y.1942) (the holding of which is not significantly impaired by the subsequent adoption of N.Y. Business Corporation Law § 713) appear particularly appropriate to the facts of this case as they presently appear on the record. In scrutinizing a directors' amendment to a stockholder-approved bonus plan, Judge Leibell declared that

> [t]he stockholders had the right to assume that the directors would honestly and disinterestedly exercise their delegated power of amendment and that they would not alter the specific provision that forfeited stock should revert to the corporation and provide in place thereof that it should revert to the Bonus Fund. Such a change would be to the detriment of the stockholders and to the profit of the bonus participants, of whom several influential directors were the most favored. *Winkelman, supra* at 1005.[17]

Judge Leibell went on to quote an early apt portion of the opinion in *Rogers v. Guaranty Trust Co.*, 288 U.S. 123, 141, 53 S.Ct. 295, 301, 77 L.Ed. 652 (1933):

> They [the stockholders] were entitled to read the proposal . . . in the light of the fundamental duty of directors to derive no profit from their own official action, without the consent of the stockholders, obtained after full and fair revelation of every circumstance which might reasonably influence them to withhold their consent.

It is entirely possible that the Simplicity stockholders have a similar entitlement that has been similarly thwarted by the directors' actions. Likewise, it is possible that the plaintiff may have too quickly capitulated on this portion of his complaint.

■ Although defendants argue that they have complied with the requirements for proxies set out in 17 C.F.R. § 240.14a–101, the May 1975 proxy in the form submitted to stockholders contained neither the amount of the lump-sum payment to James Shapiro, nor the interest rate assumption used to compute that payment, nor any clear recitation of how James Shapiro and the other defendants procured their options at the $7.75 exercise price. Whether or not this proxy satisfied the relevant Securities and Exchange Commission regulation on proxies for the election of directors, and notwithstanding plaintiffs' counsel's declaration that any misleading statement in the proxy was not material under the latest test for § 14(a) materiality, the Court is not convinced on the present record that there is no "substantial likelihood that a reasonable shareholder would consider [the allegedly misleading statements] important in de-

---

**16.** The relevant amendment to the Retirement Plan was approved by a unanimous vote of directors on November 25, 1974. Defendants argue that of those voting directors only James Shapiro, Pilson and Kenzer (who were ages 64, 65, and 64 respectively) were "interested" directors under N.Y. Business Corporation Law § 713 and, therefore, there was a sufficient number of "disinterested" directors voting to pass the amendment. However, they also note that a transaction between a corporation and one or more of its directors may be approved by a unanimous vote of all "disinterested" directors. § 713. Defendants argue that the four "outside" directors were disinterested and their unanimous vote would suffice under § 713, even if Robert Shapiro (who had already elect-

ed early retirement) and the remaining directors (Cooper, Lund and Affinito, who were ages 51, 45, and 43 respectively) were considered "interested."

**17.** It is true, as pointed out by defendants, that the Court in *Winkelman* read the amendment power portion of the bonus plan and the history behind it in such a way as to limit the Board's power to the extent of allowing it the power only to make amendments "limiting or suspending entirely the operation of the bonus plan as approved by the stockholders." Whether or not the history of the amendment provision in the plan before this Court would suggest a similar reading, the above-quoted language seems generally applicable here.

ciding how to vote." *TSC Industries, Inc. v. Northway, Inc.,* —— U.S. ——, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).[18]

This is not at all the type of case in which a "total mix" of communications to stockholders on a subject about which they were "presumably aware" cures an otherwise misleading proxy statement. *Spielman v. General Host Corp.,* 538 F.2d 39, 41 (2d Cir., 1976). The proxy statement in question here was, as far as the Court is informed, the only communication to stockholders concerning the advance retirement payments to Shapiro and the stock option adjustments of late 1974 until the notice of settlement. It clearly involved subjects about which stockholders had no knowledge, presumed or otherwise.

Accordingly, there appear to be, contrary to proponents' arguments, at least some triable issues of fact concerning plaintiffs' proxy statement claims.

Taken together on the present record the questions analyzed above raise several unresolved issues of fact and law. Nevertheless, the proposed settlement on its face does not address those issues and the proponents on both sides of that settlement contend that there is no probability of plaintiff's success on any of them. While the Court cannot look into the bargaining process that spawned this settlement, it is worth noting that an abandonment of the above-discussed issues without any consideration running to the corporation would be a dubious settlement indeed.

However, the Court's decision to disapprove the settlement rests fundamentally on the proponents' present failure to deal fairly, adequately and reasonably with the problem of the stock options. There is no sufficient factual justification placed on the record for reducing by $22. the exercise price of the stock options held by the chief executive officer and providing him on the eve of mandatory retirement with 150,000 options on stock which within a relatively brief period showed a paper profit of approximately $1,000,000. as a further *incentive to service* when he already was taking down $200,000. a year, had obtained $600,000. as a lump-sum pre-retirement pension benefit, and enjoyed the secure prospect of a guaranteed $120,000. consultant's fee for himself or his estate for ten years following termination of his active status. The Court has not been furnished with a factual record of a sufficient need for further incentive to justify the benefits which were thus showered on the dominant fiduciary of the corporation. A similar failure to factually justify the granting of the 1974 incentive options applies to Kenzer. The mix of the various other forms of compensation and the subsequent increase in the market price of Simplicity stock has made the total compensation to Shapiro and Kenzer (the two executives scheduled to retire by the end of 1976) "so large as to warrant investigation in equity [in an evidentiary hearing] in the interest of the company." *Rogers v. Hill,* 289 U.S. 582, 591, 53 S.Ct. 731, 735, 77 L.Ed. 1385 (1933).

In addition, the drastic reduction in the exercise price of the stock options, the increase in annual current salary, the increase in post-retirement consultation fees coupled with a two year early lump-sum retirement pension payment were never collated so that the stockholders could know and pass on the totality and fairness of the mix. Contrast *Spielman v. General Host Corp., supra.*

On the present record, in the face of the dubious legality of any of the new options to James Shapiro and Myron Kenzer,[19] the proposed settlement does not embrace con-

---

**18.** While it is not necessary that a proxy statement actually announce that a given shareholder-approved plan has been violated by the director-officers, *Walter v. Billera,* 1973 CCH Fed.Sec.L.Rep. ¶ 94,011 (S.D.N.Y.1974); *Laurenzano v. Einbender,* 264 F.Supp. 356, 361 (E.D.N.Y.1966), aff'd, 448 F.2d 1 (2d Cir. 1971), it is necessary that the stockholders be sufficiently informed concerning the manner in

which executives derive their benefits so as to be able to make an informed judgment concerning the election of those executives.

**19.** *See generally Jacoby v. Averell,* 1973–74 CCH Fed.Sec.L.Rep. ¶ 94,360 (S.D.N.Y.1974); *Waltzer v. Billera,* 1973 CCH Fed.Sec.L.Rep. ¶ 94,011 (S.D.N.Y.1973).

siheration which falls within the "range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." [20]

Short of an adversary trial on the merits at which the interested parties may be heard and cross-examined and their testimony evaluated on the propriety and need for the grants, the proposed settlement must be rejected unless the parties are willing to furnish additional consideration by cancellation of all of the 1974 options given to James Shapiro and Myron Kenzer.

The foregoing views are not intended to and shall not prejudice the merits of the claims and defenses upon a full trial of all the issues.

The motion to approve settlement as proposed is denied.

SO ORDERED.

**20.** *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir.), *cert. denied* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972).