**32**

OSCAR GRUSS & SON, on behalf of itself and all others similarly situated, Plaintiffs,

v.

GEON INDUSTRIES, INC., and Arthur Andersen & Co., Defendants.

75 CIV 5276 (LBS).

United States District Court, S. D. New York.

Nov. 20, 1980.

See also D.C., 75 F.R.D. 531.

Kass, Goodkind, Wechsler & Labaton, Stuart D. Wechsler, Jonathan M. Plasse, New York City, for plaintiff.

Kaye, Scholer, Fierman, Hays & Handler, Jay G. Strum, Karen Katzman, New York City, for defendant G I Export Corp. (formerly known and herein sued as Geon Industries, Inc.).

Breed, Abbott & Morgan, George P. Vary, Michael Small, New York City, for defendant Arthur Andersen & Co.

## OPINION

SAND, District Judge.

Approval is sought herein of a proposed settlement pursuant to Rule 23(e), Federal Rules of Civil Procedure. Counsel for plaintiff applies for an award of attorney's

fees and reimbursement of expenses. It is our conclusion that the proposed settlement cannot be approved because of the failure to notify adequately members of the class.

*Background*

On December 20, 1973, Geon Industries, Inc. ("Geon"), an importer and distributor of replacement parts for foreign-made vehicles, announced in a press release that Burmah Oil Company ("Burmah") had made a takeover bid and would purchase Geon's assets for the equivalent of $16.80 per share of Geon common stock. On January 14, 1974, Oscar Gruss & Son ("Gruss"), a securities broker-dealer, purchased 1,000 shares of Geon common stock at 13⅛ per share. Gruss purchased the stock for arbitrage purposes, that is, in anticipation of profiting when Burmah purchased Geon's assets at the announced higher price. On April 30, 1974, Geon issued a press release announcing that Burmah had reduced its offer to the equivalent of $11 per share because of a decline in Geon's earnings. Subsequent to this announcement, Gruss made a series of purchases of Geon stock, also for arbitrage purposes, acquiring an additional 14,500 shares at an aggregate cost of $143,212.50— approximately $9.87 per share.

On July 12, 1974, Geon announced that Burmah had withdrawn its takeover offer because three former owners of a Geon subsidiary had filed suit to rescind the sale and Burmah did not want to purchase a company involved in litigation. Following this announcement, trading in Geon stock was suspended. When it resumed, in the week between July 31 and August 8, 1974, Gruss sold its entire holding of Geon stock at prices ranging from 2¾ to 3⅛ per share. Gruss suffered a loss of $109,532.27. Three months later, on November 15, 1974, Gruss purchased 2,000 shares of Geon. It held these shares until July 18, 1975, when it sold them at a profit of $1,849.87.

On October 20, 1975, more than fourteen months after Gruss had suffered the $109,-000 loss from its sale of Geon stock, Geon announced that its earnings for the years 1971 through 1973 had been erroneously overstated by an aggregate amount of approximately $484,000. Four days later, on October 24, 1975, Gruss filed this action, charging that Geon and its independent auditors, the accounting firm of Arthur Andersen & Company ("Arthur Andersen"), in overstating Geon's income, had violated § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5.

In its complaint, plaintiff alleged that during the years 1970 through 1973, defendant Geon wrongfully included at least $500,-000 of intercompany income in its overall "net income" figures. This intercompany income, recorded in the company's books for internal use, merely reflected the dollar value of inventory and asset shifts among Geon's branches and wholly-owned subsidiaries. It did not represent any increase in Geon's actual earnings or net income. Plaintiff charged that, in violation of accepted accounting procedures, this intercompany income was improperly included and commingled with actual income to inflate Geon's "net income" figures reported in consolidated financial statements.

Plaintiff further alleged that this inflation of Geon's net income rendered materially false and misleading the company's 1970, 1971, 1972 and 1973 annual reports and 10-K Forms and its July 2, 1974 notice of annual meeting and the accompanying proxy which included consolidated financial statements for 1971, 1972 and 1973, and thereby artificially inflated the price of Geon common stock. Plaintiff charged that Geon and Arthur Andersen, the accounting firm which prepared and certified the financial statements, issued these reports with the knowledge that they were false and that investors would rely on them. Finally, plaintiff alleged that it and all those who had purchased Geon stock between January 1, 1970 and the October 20, 1975 announcement of the income overstatements were injured because they purchased the stock at an artificially inflated market price.

In its answer, Geon admitted that incorrect calculations had resulted in a $484,000 net income overstatement for the years

1971 through 1973 and a $191,000 net income overstatement for 1970 and prior years. Geon denied plaintiff's other allegations. Arthur Andersen denied essentially all of plaintiff's allegations.

*Summary of the Action: Class Certification and Notice*

In October 1976, Geon moved for certification of a class of all persons who had purchased Geon common stock between January 1, 1970 and October 20, 1975 (the "expanded class"). In July, 1977, this Court (Goettel, J.) granted plaintiff's motion in part. *Oscar Gruss & Son v. Geon Industries and Arthur Andersen & Co.,* 75 F.R.D. 531 (S.D.N.Y.1977). The Court found that plaintiff's claims were not typical of the claims of persons who had purchased Geon stock before the Burmah takeover bid or of purchasers who had sold Geon stock after the disclosure of the income overstatement. *Id.* at 535. It thus certified a class composed only of those persons who had purchased Geon stock during the period the takeover bid was pending (December 20, 1973 to July 12, 1974) and who also had sold prior to the October 20, 1975 disclosure (the "restricted class"). *Id.* The Court further subdivided the class into those who had purchased while the takeover bid was pending but before the downward revision of the per share price from $16.80 to $11, and those who had purchased while the bid was pending but after this downward revision of price. *Id.*

Following certification, the parties conducted extensive discovery for several months before beginning settlement discussions. Although plaintiffs indicated a willingness to proceed with respect to the restricted class, including notification of the members of the restricted class of the pendency of the suit, defendants insisted as a condition to settlement, that all claims of the expanded class, rather than only those of the certified restricted class, be resolved. This desire added to the major obstacle to agreement among the parties: how to notify the class and how to allocate the costs of notice among the parties.

The expanded class consisted of everyone who had purchased Geon stock during a period of five and one half years, including beneficial purchasers, that is, customers for whom brokerage firms had purchased and held stock in the "street name". Records subpoenaed from the American Stock Exchange indicated that during the expanded class period approximately 188 brokerage firms had purchased approximately 4.8 million shares of Geon stock. Neither plaintiff nor defendants were then willing to bear the costs of obtaining the names and addresses of the beneficial purchasers of this stock from all the brokerage firms.

In an effort to overcome this obstacle to settlement, plaintiff proceeded to explore some of the suggestions advanced by the court in *In re Franklin National Bank Securities Litigation,* 574 F.2d 662 (2d Cir.) *modified* 599 F.2d 1109 (2d Cir. 1978). Plaintiff's counsel first wrote to approximately 60 brokerage firms which were record purchasers of Geon stock requesting them to provide plaintiff voluntarily with the names and addresses of the beneficial purchasers for whom they held stock. When several of the firms refused to accede to this request, plaintiff served the firms with subpoenas duces tecum, pursuant to Rule 45(b) of the Federal Rules of Civil Procedure, requiring them to produce the names and addresses.

Of the five firms upon which plaintiff initially served subpoenaes, one, Edward A. Viner & Co., Inc. ("Viner"), refused to comply with the subpoena or to provide any information unless plaintiff agreed to pay the costs and expenses that Viner would incur by complying. Viner argued that it did not have the names and addresses of the beneficial purchasers and would have to extract them manually from five years of daily stock records. Viner took the position that plaintiff could perform this manual task as easily as it could, and that if it were to do the task for plaintiff, it should be reimbursed. Viner offered to make its daily stock records available to plaintiff. Plaintiff moved for a contempt citation against Viner for willful noncompliance with a subpoena and to compel discovery of

the requested information at Viner's expense. This Court deferred ruling on the contempt motion until plaintiff had subpoenaed additional brokerage firms.

Plaintiff subsequently subpoenaed 17 more firms and requested the voluntary cooperation of another 58. By the summer of 1979, plaintiff had been in contact with all of the 188 brokerage firms listed as record purchasers of Geon stock and had served subpoenas on 95 of them. Forty-two of the firms, representing 27.5% of the purchases of Geon stock, voluntarily provided the information requested. Thirty-three of the firms, representing approximately 4% of the purchases, indicated they did not have any information identifying beneficial Geon purchasers. Forty-seven of the subpoenaed firms, representing 18.9% of the purchases, provided the information in response to subpoena without requesting reimbursement for their expenses. Five of the subpoenaed firms, representing 3.6% of the purchases, indicated that they had no information identifying beneficial purchasers. Thus, 127 of the brokerage firms with which plaintiff had been in contact, representing 54% of the purchases of Geon stock, provided the names and addresses of the beneficial purchasers without requesting reimbursement. These firms identified approximately 2,536 class members.

The remaining brokerage firms either failed to respond to the subpoenas or refused to provide the information requested without reimbursement. Plaintiff estimated that such reimbursement would total approximately $32,500,[1] an amount nearly equal to that which would remain in the proposed settlement fund after the deduction of costs of administration and proposed attorney's fees.

In the summer of 1979, the joint counsel for seventeen of the firms which predicated compliance with the subpoena upon reimbursement moved to quash or modify the subpoenas. The motion to modify would have provided that the firms would make their books and records available for plaintiff's inspection during work hours or, alternatively, that the firms would themselves go through these records and extract and compile the names and addresses of beneficial purchasers manually, or by computer where possible, on the condition that they be reimbursed for the cost of doing so. This Court postponed consideration of this motion while the parties conducted further settlement discussions. In October, 1979, the parties entered into a Stipulation of Settlement, plaintiff withdrew the subpoenas duces tecum which it had served on the noncooperating brokerage firms, and joint counsel for seventeen of the firms withdrew its motion to quash or modify the subpoenas.

On October 30, 1979, this Court ordered the class redefined for settlement purposes only.[2] This order expanded the class to its original composition of all persons who had purchased Geon common stock between January 1, 1970 and October 20, 1975. On November 9, with the consent of the parties, this Court issued an order which set out the conditions for notifying the class and scheduled a hearing for February 6, 1980 to give class members an opportunity to approve or object to the settlement. The order established that plaintiff would mail individual notices by December 4, 1979 of the certification of the class, the proposed settlement, and the settlement hearing to all individuals and entities whose identities and addresses were given to plaintiff's counsel voluntarily or pursuant to subpoena by brokerage firms, and to all individuals

---

1. Following a conference on September 17, 1980, plaintiff reduced this estimate to approximately $20,000.

2. "Creating provisional classes for settlement purposes, although not a common practice, is not unheard of, nor, where appropriate, frowned upon." *Stull v. Baker*, 410 F.Supp. 1326, 1331 n.1 (S.D.N.Y.1976) (*citing Girsh v. Jepson*, 521 F.2d 153, 155 n.3 (3d Cir. 1975);

*Greenfield v. Villager Industries, Inc.*, 483 F.2d 824, 832 (3d Cir. 1973)). *See Desimone v. Industrial Bio-Test Laboratories*, 83 F.R.D. 615, 618 (S.D.N.Y.1979) (settlement class certified where certification had been twice previously denied); *Bullock v. Estate of Kircher*, 84 F.R.D. 1, 3 (D.N.J.1979); *Steinberg v. Carey*, 470 F.Supp. 471, 473 (S.D.N.Y.1979).

and entities whose identities and addresses were listed on Geon's shareholder list as of September 20, 1975. The order also established that plaintiff would publish a notice of the class action determination, proposed settlement, and settlement hearing in the December 4, 1979 National Edition of the Wall Street Journal. The terms of the order were carried out by the parties.

As of April 18, 1980, in response to this class notice, plaintiff's counsel had received 520 proof of claim forms representing 910,-491 of the four million shares of Geon common stock potentially in the class, claiming losses of $5,980,851. As of September 17, 1980, plaintiff's counsel had received 553 proof of claim forms.[3] Fifty four of the proof of claim forms reflected purchases made during the restricted class period, accounting for 288,000 of the approximately 785,500 shares traded during the restricted class period. Plaintiff's counsel had also received seventeen requests for exclusion. Ten of these requests for exclusion reflected purchases made during the expanded class period. The remaining seven requests did not indicate the date of purchase of the shares. None of the requests for exclusion referred to shares purchased during the restricted class period. No objections to the proposed settlement were filed.[4]

*The Proposed Settlement*

The proposed settlement provides for the establishment of a $70,000 settlement fund, placed in escrow pending approval of the proposed settlement. Each defendant contributed $35,000 to this fund. Upon the entry of the order scheduling a settlement hearing, $5,000 was paid out of the fund to the Administrator to be used for administration costs, including the cost of notice.

Additional initial administrative costs were advanced by plaintiff's counsel. If the settlement were approved, the fund would be disbursed initially to reimburse plaintiff's attorneys' advances for administrative costs, and to pay attorneys' fees, to the extent awarded by this Court. The remainder of the fund would then be distributed to class members (a) who did not request exclusion from the class within 60 days after the date of notice of the proposed settlement; (b) who submitted completed proof of claim forms and releases within 60 days after the settlement hearing; and (c) whose proofs of claim were allowed. Class members who failed to request exclusion from the class or to file a proof of claim within the specified periods would not receive any payments, but would be bound by the settlement, if approved.

The proposed settlement provides for distribution of the fund to class members based on each class member's "recognizable claim". A member's "recognizable claim" is 100% of the loss incurred by the sale of any Geon stock purchased between January 1, 1970 and October 20, 1975. The ratio between an individual member's "recognizable claim" and the total of all claimants' "recognizable claims" determines the individual's proportionate share of the fund.

The $70,000 proposed settlement fund would amount to 1.17% of the $5,980,851 claimed losses of the class. After deduction of administrative costs and the proposed attorneys' fees, the fund would represent an even smaller percentage of the claimed losses. Although this disparity between the claimed losses and the amount offered in settlement is not determinative of the adequacy of the proposed settlement,[5] it re-

3. The number of shares represented by the additional forms and the amount of the losses claimed therein were not submitted to the Court.

4. The absence of objections to the proposed settlement does not diminish this Court's obligation to evaluate carefully the adequacy of the settlement, especially where, as in the instant case, not all members of the class have received individual notice. *See In re Traffic Executive Association—Eastern Railroads et al.,*

627 F.2d 631, 634 (2d Cir. 1980); *United Founders Life Ins. Co. v. Consumers National Life Ins. Co.,* 447 F.2d 647, 655 (7th Cir. 1971); *Goldsholl v. Shapiro,* 417 F.Supp. 1291, 1296 (S.D.N.Y.1976); *Fricke v. Daylin, Inc.,* 66 F.R.D. 90, 97 (E.D.N.Y.1975).

5. The Second Circuit Court of Appeals noted in *City of Detroit v. Grinnell Corp.,* 495 F.2d 448 (2d Cir. 1974), "[t]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself,

quires this Court to evaluate with extreme care the adequacy of the notice given to the class, the strength of plaintiff's case and the likelihood of recovery.

*Adequacy of Notice*

The initial factor relevant to our consideration of the proposed settlement is the adequacy of the notice given to the class. Rule 23(c)(2) of the Federal Rules of Civil Procedure provides:

> In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.

The question before the Court [6] is whether the notice set forth above constitutes "individual notice to all members who can be identified through reasonable effort". We conclude that it does not.

■ As the Supreme Court has interpreted Rule 23(c)(2), "notice by publication is not enough with respect to a person whose name and address are known or very easily ascertainable and whose legally protected interests are directly affected by the proceedings in question." *Schroeder v. City of New York*, 371 U.S. 208, 212–13, 83 S.Ct. 279, 282, 9 L.Ed.2d 255 (1962). The representative of the class of plaintiffs is responsible for and must pay the costs of sending individual notice to class members whose names and addresses can be ascertained with reasonable effort. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–79, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974) (*"Eisen IV"*). If the class representative is unwilling to assume the burden of notifying the

class, the action must be dismissed. *Id.* at 179, 94 S.Ct. at 2153; *see also*, Note, *Identifying the Faces Behind the Street Names—Who Pays? In Re Franklin National Bank Securities Litigation*, 11 Conn.L.R. 110, 124 (1978).

■ The cost of identifying class members is part and parcel of the cost of notifying class members. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 356–59, 98 S.Ct. 2380, 2392–2393, 57 L.Ed.2d 253 (1978). Thus, although the district court has discretion under Rule 23(d) of the Federal Rules of Civil Procedure to direct the defendant to perform a task to identify class members if the defendant can do so more efficiently than the plaintiff, the general principle underlying *Eisen IV* provides that the representative of the class of plaintiffs must bear the burdens of identifying and notifying the class. *Oppenheimer Fund, Inc. v. Sanders, supra*, 437 U.S. at 358, 98 S.Ct. at 2393. This principle also controls a district court's exercise of discretion in deciding whether to require plaintiff to reimburse defendant for expenses incurred in identifying class members. *Id.* Thus, even where the defendant controls the records containing the names and addresses of class members, the plaintiff generally must extract the information or pay defendant for extracting it from these records. *See id.; In re Nissan Motor Corp. Antitrust Litigation*, 552 F.2d 1088, 1102–03 (5th Cir. 1977).

The Supreme Court has not addressed the question of who is responsible for and must pay the costs of extracting the names and addresses of class members from records held by nonparties, such as brokerage firms and banks.[6a] As these institutions fre-

---

mean that the proposed settlement is grossly inadequate and should be disapproved." *Id.* at 455. The court added in a footnote: "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Id.* at 455 n.2. *See also, Spiekermann v. Whittaker Corp.*, No. 74–1270, slip op. at 10 (E.D.N.Y. April 17, 1978) ("A court will not reject a settlement proposal solely because the amount offered may represent no more than a small fraction of the potential recovery.").

**6.** Although the Court approved the sending of the notice of settlement and has been apprised of the various steps taken by the parties, a present determination by the Court of the validity and efficacy, under Rule 23, of the notice is not precluded. *See In re Traffic Executive Assoc.—Eastern Railroads et al., supra* 627 F.2d at 634.

**6a.** *Cf. Oppenheimer Fund, Inc. v. Sanders, supra* at 359–60, 98 S.Ct. at 2393–2394 (records in possession of transfer agent, subject to defendant's right to control records).

quently are record owners of the securities they purchase and hold for individual investors, their records are often the only source of information identifying the beneficial owners, who are members of a certified class of shareholders. As noted *supra*, the Court of Appeals for the Second Circuit addressed the problem of beneficial owner searches in *Franklin National Bank*, a securities fraud class action brought on behalf of purchasers of stock in the Franklin New York Corporation. The Court (Medina, J.) held, *inter alia*, that the district court had no jurisdiction over non-party brokerage firms and thus could not compel them to compile lists of the names and addresses of beneficial owners of the stock;[7] that the district court could not shift identification or notice costs to defendants; that mailing notice to the brokerage firms with directions to forward it to beneficial owners was not sufficient compliance with the Rule 23 notice requirement; and that the class representatives, not the brokerage firms, had responsibility for ascertaining the names and addresses of beneficial owners, for mailing individual notice to these owners, and for paying the costs of performing these tasks. *Id.* at 672.

In sum, the court interpreted the Rule 23 requirements of "best notice practicable" and identification "through reasonable effort" to mean that the class representative must send individual notice to all beneficial owners of stock whose names and addresses the representatives can ascertain by searching brokerage firm records. *Id.* at 672, 674. Judge Medina then suggested several procedures for district courts to follow to mitigate the adverse financial impact of the decision on class representatives. He recommended that the class representative first request the brokerage firms and other record owners to voluntarily provide the names and addresses of beneficial owners. *Id.* at 674–75. If this request is refused, the class representative should ask the court to

serve the record owners with a subpoena, pursuant to Rule 45(b) of the Federal Rules of Civil Procedure, commanding the delivery of the information. *Id.* at 675. Judge Medina also recommended that the trial judge monitor plaintiff's progress in eliciting the identities of class members and establish a continuing hearing which might remain open until "final disposition of all matters concerning" notice to the class. *Id.* at 674. Judge Medina noted that

> [o]ne of these matters is likely to be the direction of notice by publication with respect to a certain number of beneficial owners whose identity cannot be established by reasonable effort.

*Id.*

As noted, *supra*, this Court implemented Judge Medina's suggested procedures. At our direction, and with regular monitoring, plaintiff's counsel obtained the names of the brokerage firms holding Geon stock, wrote to these firms requesting lists of the beneficial owners of the stock, and served subpoenas duces tecum on those firms which refused to compile and produce the lists voluntarily. The subpoenas requested the production of documents listing the names and addresses of the beneficial owners of Geon stock. The brokerage firms, contending that such documents did not exist and could only be created by extracting the names and addresses from daily and weekly stock trading records, refused to comply with the subpoenas unless plaintiff reimbursed them for the costs of creating the requested documents. Alternatively, they offered to make the existing records available at their offices so that plaintiff could extract the required information. Plaintiff refused to perform the research or to reimburse the brokerage firms for doing so.

This Court is thus confronted with the problem, not directly reached by Judge Medina, of how to proceed when requests by

---

7. The district court lacked jurisdiction over the brokerage firms because subpoenas had not been served on them. 574 F.2d at 668–69. In the instant case, subpoenas had been served on the brokerage firms; however, as noted *infra*, we question the power of Rule 45(b) subpoenas to compel the brokerage firms to do anything more than place the relevant records at plaintiff's disposal for a search by plaintiff.

letter and subpoena fail to result in voluntary cooperation in the identification of beneficial owners by the brokerage firms.

As Judge Medina noted, it might be appropriate to allow notice by publication with respect to those beneficial owners not identified to date, if plaintiff had made a "reasonable effort" to identify them. We need not determine whether notice by publication would ever be appropriate. However, in the instant case, publication is not appropriate notice in light of the nominal settlement proposed, the large portion of the class which has not been individually notified, and our finding, *infra*, that plaintiff has not made the "reasonable effort" to identify class members required by Rule 23 and *Eisen IV*.

▋ Alternatively, we have considered whether we might order the brokerage firms to compile lists of beneficial owners, and hold the firms in contempt of court if they refuse to compile the lists without compensation. We decline to order the firms to compile the lists without compensation because, in our view, such an order would be contrary to the principles established by *Eisen IV* and *Oppenheimer Fund, Inc. v. Sanders.*[8]

In *Eisen IV* and *Oppenheimer*, the Supreme Court established the principle that identification costs and tasks are generally the responsibility of the named plaintiff, not the defendant, because it is the plaintiff who seeks to maintain the suit as a class action. *Oppenheimer Fund, Inc. v. Sanders, supra*, 437 U.S. at 356, 359, 98 S.Ct. at 2393. This general principle applies with equal or greater force to the problem of allocating identification costs and tasks between the representative plaintiff and non-party brokerage firms,[9] and therefore mandates that,

if individual notice must be sent to all beneficial owners, plaintiff must either perform the identification tasks or reimburse the brokerage firms for identifying the beneficial owners.

However, the *Oppenheimer* court recognized exceptions to the plaintiff's obligations to reimburse defendant when (1) the expense involved is "so insubstantial as not to warrant the effort required to calculate it and shift it to the representative plaintiff . . . or [2] the task ordered is one that the defendant must perform in any event in the ordinary course of its business." *Id.* at 359, 98 S.Ct. at 2393.

The brokerage firms which plaintiff subpoenaed contended that neither of the *Oppenheimer* exceptions applied to the task of compiling the names and addresses of Geon purchasers. Plaintiff contended that both exceptions applied, noting that the cost to each individual firm was insubstantial while the aggregate cost that it would have had to bear was approximately $32,500.[10] To support this view, plaintiff cited Judge Gurfein's statement in *Blank v. Talley Industries, Inc.*, 54 F.R.D. 627 (S.D.N.Y.1972), that it would be "unfair to compel the plaintiffs to cover the costs of the [brokerage] firms' production of information, which costs when cumulated would indeed be burdensome. . . . These expenses are in the nature of overhead expenses necessary for responding to legitimate court orders involving the customers of stock brokers." *Id.* at 627. Judge Gurfein thus ordered Merrill Lynch, Pierce, Fenner & Smith to provide the requested names and addresses of stockholders without being reimbursed the $570 it had requested.

---

**8.** We also question the power of Rule 45(b) subpoenas to require the brokerage firms to compile the requested information without reimbursement. *See Oppenheimer Fund, Inc. v. Sanders, supra* at 354, 359–64, 98 S.Ct. at 2393–2396; 5A Moore's Fed.Pract. ¶ 45.05[1] at 45–35, 45–36 (2d ed. 1980).

**9.** *See* note, *Cost of Notice in Class Actions After Oppenheimer Fund, Inc. v. Sanders*, 78 Colum.L.Rev. 1517, 1534 (1978).

**10.** As noted *supra*, this estimate was subsequently reduced to approximately $20,000. However, we do not find the reduction significant enough to alter our view that the cost of searching the brokerage firms' records would be substantial.

Although Judge Medina also cited *Blank v. Talley* as a guide to dealing with recalcitrant brokerage firms, *see Franklin National Bank, supra,* 574 F.2d at 675, we note that, in *Blank v. Talley,* all other brokerage firms had complied voluntarily and the burden imposed on Merrill Lynch was *de minimus.* In our view, on its own terms and after *Oppenheimer, Blank v. Talley* does not support the imposition of $20,000 or $32,000 of notice-related costs on at least twenty non-cooperating brokerage firms which are not parties to this action.

In the instant case, joint counsel for seventeen of the brokerage firms submitted an exhibit listing the firms' costs of identifying class members, ranging from $300 to $3,000. The exhibit also sets forth that nine of the seventeen firms, in the period of October, 1978 to October, 1979, received reimbursement for beneficial owner searches in 182 class actions. Moreover, the brokerage firm of Edward A. Viner & Co. receives two subpoenas or requests for beneficial owner searches per week, and estimates a yearly cost of $50,000 for such searches. Similar information was not available with respect to the eight other firms represented by joint counsel or with respect to the firms not represented by joint counsel.

The statistics outlined above illustrate that beneficial owner searches without reimbursement would significantly increase the brokerage firms' costs, with a likely increase in transaction costs to all investors. *See In re Penn Central Securities Litigation,* 560 F.2d 1138, 1145–46 (3d Cir. 1977). In light of the principle of *Eisen IV* and *Oppenheimer* that the representative plaintiff is responsible for the costs of identifying the class members, *see Oppenheimer Fund, Inc. v. Sanders, supra,* at 350, 356, 98 S.Ct. at 2389, 2392, we are precluded from shifting the costs of identifying the class from the representative plaintiff to investors at large, who have even less stake in identification of the class than the defendants to whom the court in *Oppenheimer* refused to shift the costs. *See id.* at 358–59, 98 S.Ct. at 2393. Therefore, on the facts presented here, we will not order the brokerage firms to perform the beneficial owner search without compensation.

We thus turn to the question whether plaintiff's notification of the class satisfies the "reasonable effort" requirement of Rule 23.

In *Eisen IV,* the Supreme Court held that, without regard to plaintiff's ability to pay, Rule 23 mandated individual notice to the 2,250,000 class members whose names were "easily ascertainable" by comparing the teletype records of the two defendant odd-lot firms with computerized records of names and addresses maintained by general service brokerage firms. · 417 U.S. at 166 n.5, 175 · 76, 94 S.Ct. at 2151. Moreover, the Court explained:

[I]ndividual notice to identifiable class members is not a discretionary consideration to be waived in a particular case. It is, rather, an unambiguous requirement of Rule 23. As the Advisory Committee's Note explained, the Rule was intended to insure that the judgment, whether favorable or not, would bind all class members who did not request exclusion from the suit. 28 U.S.C.App., pp. 7765, 7768. Accordingly, each class member who can be identified through reasonable effort must be notified that he may request exclusion from the action and thereby preserve his opportunity to press his claim separately or that he may remain in the class and perhaps participate in the management of the action. There is nothing in Rule 23 to suggest that the notice requirements can be tailored to fit the pocketbooks of particular plaintiffs. ·

*Id.* at 176, 94 S.Ct. at 2151 (footnote omitted). The Court thus remanded *Eisen IV* with instructions to dismiss the class action. *Id.* at 179, 94 S.Ct. at 2153.

The effort required for plaintiff Gruss to identify the class members is similar to that required in *Eisen IV,* and we therefore conclude that, to satisfy Rule 23, plaintiff must notify all beneficial owners who can be identified by searching the brokerage firms' records. Notice to less than all of the class members who would be identified by such a search is inadequate. Since notice has not

been provided to all identifiable class members, the proposed settlement cannot be approved.[11]

\* \* \* \* \* \*

On September 17, 1980, the Court held a conference during which the parties were advised of the Court's view with respect to the inadequacy of the notice to the class. Thereafter, the parties submitted a proposal, embodied in an order signed today, for notification of all members of the class who can be identified by a search of the brokerage firms' records. Accordingly, the originally proposed settlement is disapproved because of the inadequacy of the notice to the class. The adequacy of the settlement proposed in the order signed today will be considered after the notice and hearing called for in that order.

SO ORDERED.

---

11. Having found the notice inadequate, we need not reach any other questions with respect to the adequacy of the proposed settlement or the requested attorneys' fees.